966 A.2d 939

STATE of Maryland, et al.

v.

MARYLAND STATE FAMILY CHILD
CARE ASSOCIATION, et al.,

No. 1572, Sept. Term, 2007.

Court of Special Appeals of Maryland.

March 5, 2009.

david R. Moore (Austin C. Schlick, Douglas F. Gansler, Atty. Gen., on brief), for Appellant.

Michael D. Smigiel, Sr., Elkton, Mark L. Rosenberg, Bethesda, for Appellee.

Panel: MEREDITH SALMON, LAWRENCE, F. RODOWSKY, Ret., Specially Assigned, JJ.

SALMON, J.

This appeal concerns the validity of Executive Order 01.01.2007.14, which was signed by Governor Martin O'Malley on August 7, 2007, and published in the Maryland Register on August 31, 2007. At the request of the appellees (who will be identified infra.), the Circuit Court for Cecil County, on November 2, 2007, granted a preliminary injunction prohibiting Governor O'Malley and the State of Maryland from enforcing or carrying out the terms of the executive order. Governor O'Malley and the State filed a timely appeal along with a motion for a stay of the injunction. Because the circuit court did not act on the motion for a stay in a timely manner, the appellants sought a stay in this court. We granted that stay.

# I

## Background

The Executive Order here at issue concerns Maryland's Purchase of Care Program ("POC Program"). The POC Program is designed to allow the State to give financial support to working families in Maryland who have child care expenses. The POC Program is administered by the local departments of social services. COMAR 13A.14.06.06 A–B 11 H. All participation is voluntary. Once a child care center or family child care provider elects to participate in the program, it must abide by the rules and regulations of the program, which are determined by the Maryland State Department of Education. These rules and regulations establish a reimbursement rate. That rate is set according to the family's

income, the family size, and the geographic area of the state. *See* COMAR 13A.14.06.03. The POC Program regulations also establish the terms and conditions of reimbursement. For example, a provider is only paid for a fixed number of vacation days and for a prescribed number of days after a family gives notice that it is leaving the child care center or family child care provider. COMAR 13A.14.06.11H.

The POC Program regulations set a "co-pay" for each family, based upon the family's size and income level. If, however, the child care center or the family child care provider charges more than the reimbursement rate plus the co-pay established by the State, it is allowed to charge the parents that additional amount. Thus, the relationship between the family child care provider and the State is essentially a contractual relationship, in that the provider may choose to accept (or reject) the terms and conditions that are set by the State. Likewise, the relationship between the family child care provider who elects to participate in the POC Program and the parents is essentially contractual in nature. The family uses the POC Program voucher as a partial payment for the family's child care expense, and the family child care provider accepts that voucher, subject to the rules and regulations of the POC Program.

In addition to providing funding for the children of working parents in licensed child care centers and with licensed family child care providers, the POC Program also provides funding for what is called "informal care," i.e., care provided by relatives of the children for whom care is given. These "informal care" providers are generally not required to be licensed by the State, so long as they are only caring for children who are their relatives. "Informal care" providers are reimbursed at a much lower rate than family child care providers. *See* COMAR 13A.14.06.06.C and 11A–G.

## II

### The Executive Order

The Executive Order here at issue reads in material part as follows:

A. The State shall recognize a provider organization designated by a majority of the registered and registration exempt family child care providers who participate in the State's Child Care Subsidy Program known as the [POC], voting in a mail ballot election, as the representative of the POC providers in the State. A provider organization may petition for certification by submitting a petition for representation to the official or officials designated by the Governor to administer this Order. The petition must be accompanied by a showing of interest supported by 30 percent of the providers in the appropriate unit indicating their desire to be represented by the petitioner for the purpose of collective bargaining ... Any interested organization that wishes to intervene must submit a petition of intervention which must be accompanied by a showing of interest supported by 10 percent of the providers in the appropriate bargaining unit indicating their desire to be exclusively represented by the intervener for the purpose of collective bargaining, which petition must be filed within 15 days of notice of the pending election petition.

\* \* \*

B. Certification of a provider majority bargaining representative shall continue so long as such organization satisfies the criteria of this Order and subsequent guidelines applicable to certification. A petition to decertify an existing majority bargaining representative may be filed in the same manner as a petition for certification, as provided in Section A of this Order, except that no · decertification petition may be filed for any bargaining unit if

1) A majority bargaining representative for that bargaining unit has been certified within the preceding 2 years; or

2) The bargaining unit has in effect a valid memorandum of understanding that, by its terms, does not exceed 8 years in duration; provided that the limitation imposed by this paragraph shall not bar the filing of a decertification petition within the 80-day period immediately preceding the expiration of such memorandum of understanding.

C. The State, through the Governor, shall designate appropriate representatives to meet and confer with the provider representative concerning the terms and conditions of the participation of family child care providers in the POC Program, including reimbursement rates under the POC Program, payment procedures, and benefits. Any agreement reached shall be reduced to writing. If any of the provisions of the agreement require legislative action, the parties will jointly seek the enactment of such legislation.

D. Nothing in this Order shall in any way diminish or infringe on any rights, responsibilities, power or duties conferred by the Constitution of the State of Maryland and the Annotated Code of Maryland. The designation of representatives by the Department under this Order does not prevent the designated provider organization or any other organization or individual from communicating with any State official on matters of interest, including appearing before or making proposals to the Department at a public meeting or hearing or at any other Department forum. This Order does not mandate participation by any child care provider.

## III

After issuance of the Order quoted above, only one candidate, the Service Employees International Union ("SEIU"), through its affiliate Kids First Maryland, SEIU Local 500, petitioned to be certified as the negotiating representative of POC providers. On August 20, 2007, SEIU Local 500 supplied the requisite documentation of support (at least 30% of all POC providers), whereupon the Secretary of the Department of Labor, Licensing and Regulations ("DLLR") notified the MSFCCA (Maryland State Family Child Care Association) and other provider organizations of SEIU's petition.[1] No other organization sought to intervene in the election.

---

1. The MSFCCA is a state-wide trade association composed of over 2,000 family child care providers.

Beginning on September 7, 2007, DLLR administered an election to designate a certified bargaining representative for POC providers. The election was held at the expense of the SEIU and was overseen by the American Arbitration Association. Votes were due on September 24, 2007. Immediately after the election the American Arbitration Association certified to the Secretary of DLLR that SEIU had received 1,357 votes out of 1,694 cast. The SEIU local was therefore selected as the certified, non-exclusive representative of POC providers.

Meanwhile, on September 20, 2007, the MSFCCA filed a complaint in the Circuit Court for Cecil County to prevent the designation of a rival labor organization as the representative of POC providers under the Executive Order. The MSFCCA was joined as a plaintiff in the complaint by nine of its members, along with Delegate Michael D. Smigiel, Sr. and Senator Allan H. Kittleman, two members of the Maryland General Assembly. The plaintiffs sought a temporary restraining order ("TRO"), a preliminary injunction against implementation of the Executive Order, as well as a judgment declaring that the Executive Order was "void *ab initio* and unenforceable."

The Circuit Court for Cecil County held a hearing on October 4 and 5, 2007, concerning the issue of whether a preliminary injunction should be granted. At the conclusion of the hearing, the circuit court took the matter under advisement and, on November 2, 2007, granted the plaintiffs a preliminary injunction prohibiting the enforcement of the Executive Order.

The circuit court found that the Executive Order constituted a regulation as defined in the Administrative Procedure Act (APA). *See* Md.Code (2004 Repl.Vol.), sections 10–101 *et. seq.* of the State Government Article. Relying on *Delmarva Power & Light Comp. v. Public Service Comm.*, 370 Md. 1, 803 A.2d 460 (2002), the circuit court opined that the Executive Order at issue was invalid and should have "no force or effect"

because it had not been enacted in compliance with the APA. The court concluded its written opinion with these words:

> This court has been called upon to grant or not grant a preliminary injunction in this matter pending a trial on a complaint for declaratory judgment. For the reasons already stated it appears that the plaintiffs would have a real probability of prevailing in such an action. It would also appear that since [the plaintiffs] would prevail, the Executive Order at issue would be void *ab initio*. In weighing the likely injuries to the parties it appears that no injury would occur to the defendants by granting the injunction. If the court's findings in this case are overturned on appeal or simply not followed by the declaratory judgment court, the process set out in the Executive Order could begin anew with elections held and an exclusive bargaining representative concerning procedures and policies would most likely be void and their having already been wrongly implemented could adversely affect some of the POC providers not in agreement with those procedures and/or policies. POC providers adversely affected by such wrongly implemented policies and procedures or those whose voices were not heard due to the implementation of the Executive Order could suffer irreversible economic injury. Additionally, an injury can almost be presumed if an agency of the state is operating on an Executive Order which is of no force or effect but with which POC providers are expected to comply.

> This in no way implies that the stated objective of the Executive Order is "wrongful." On its face it appears to be a very rational, logical approach to deal with the POC providers scattered all over the state and something with which either the executive or legislative branch, or both, should be concerned. The "wrongfulness" simply applies to the method by which implementation was attempted.

> Finally, the public interest is best served when representatives and agencies of the state are operating under lawful orders and by lawful means. The public interest is not

served when a state agency or unit operates, at least in part, pursuant to an invalid rule or order.

The circuit court, in a footnote to its opinion and order, provided the following comment:

What really seems to be of concern is the following. Plaintiff MSFCCA views this Executive Order as a way for those in the executive branch to require representation by the [SEIU], thereby seriously weakening the power of [the MSFCCA] in representing its members. Testimony was also presented which indicated the SEIU and AFSCME (American Federation of State, County, and Municipal Employees) had divided up the states for representation in these types of matters with SEIU having Maryland. Plaintiff MSFCCA believes that there will be a negative effect in the short and long run that as members of the SEIU they will have to pay union dues, will have to compete internally with relative providers receiving payment vouchers, and will have to have the issue of medical insurance to providers ad[e]quately handled. They believe that their voice will not be heard and/or considered by the executive branch. *In many ways this seems to really be a battle between the plaintiff MSFCCA and the SEIU, i.e., between two unions OR, between two organizations OR, between one union and one organization, however, one cares to categorize these units.*

(Emphasis added.)

As phrased by the Governor, the question raised in this appeal is:

Did the circuit court err when it issued a preliminary injunction barring the Governor from implementing his preferred mechanism for selecting a non-exclusive negotiating partner, where the record did not reveal any legally cognizable injury to Appellees as a result of the challenged Executive Order, the Executive Order is within the Governor's constitutional and statutory authority, and the Executive Order furthers both important governmental interests and the public interest?

We shall answer that question in the affirmative and reverse the circuit court.

## IV

The appellees in this case are the MSFCCA, nine of its members, Delegate Michael Smigiel, Sr. and Senator Allan Kittleman. The appellants are Governor Martin O'Malley and the State of Maryland. Seiu, as an *amicus curiae*, has filed a brief in support of appellants' position.

 In order to preliminarily enjoin the Governor's chosen approach to obtain the input of child care providers concerning the POC Program, it was necessary to find that the plaintiffs met four requirements: 1) plaintiffs had a "real probability of prevailing on the merits, not merely a remote possibility of doing so"; 2) lesser injury would be done to the Governor by granting the injunction than would result to plaintiffs by denying it; 3) that plaintiffs would suffer irreparable injury unless the injunction was granted; and 4) that the public interest favored an injunction. *Fogle v. H & G Rest., Inc.*, 337 Md. 441, 455–56, 654 A.2d 449 (1995). The burden of proving facts sufficient to satisfy each of those factors rested on the plaintiffs, and the "failure to prove the existence of even one of the four factors will preclude the grant of preliminary [injunctive] relief." *Id.* at 456, 654 A.2d 449.

## V

### Likelihood of Success

The circuit court, as mentioned *supra*, ruled that the appellees had a "real probability" of obtaining a permanent injunction because, in the court's view, the executive order issued by the Governor constituted a "regulation" within the meaning of the APA, yet the Governor had not complied with the requirements of the APA. The APA's definition of a regulation is set forth in S.G. section 10–101(g).

Section 10–101(g) reads: (1) "Regulation" means a statement or an amendment or repeal of a statement that:

(i) has general application;

(ii) has future effect;

(iii) *is adopted by a unit to:*

1. detail or carry out a law that the unit administers;

2. govern organization of the unit;

3. govern the procedure of the unit; or

4. *govern practice before the unit;* and

(iv) is in any form, including:

1. a guideline;

2. a rule;

3. a standard;

4. a statement of interpretation; or

5. a statement of policy.

(2) "Regulation" does not include:

(i) a statement that:

1. concerns only internal management of the unit; and

2. does not affect directly the rights of the public or the procedures available to the public;

(ii) a response of the unit to a petition for adoption of a regulation, under § 10–123 if this subtitle; or

(iii) a declaratory ruling of the unit as to a regulation, order, or statute, under Subtitle 3 of this title.

(3) "Regulation", as used in §§ 10–110 and 10–111.1, means all or any portion of a regulation.

(Emphasis added.)

Important for our purposes is the part of the above definition that states that to be a regulation within the meaning of the APA, the statement must be "adopted by a unit."

Appellants contend that the executive order was not "adopted by a unit" and therefore it was not 1) a "regulation" and 2) because it was not a regulation, the Governor did not have to abide by the rule-making requirements of the APA.

Section 10–101(i) of the State Government Article provides:

(i) *Unit*—"Unit" means an officer or unit authorized by law to adopt regulations.

The parts of the APA dealing with rule-making are set forth in S.G. (2004 Repl.Vol.), sections 10–101–139 (hereinafter "subtitle 1"). Section 10–102 provides:

(a) *In general.*—Except as otherwise expressly provided by law, this subtitle applies to:

(1) each unit *in the Executive Branch* of the State government; and

(2) each unit that:

(i) is created by public general law; and

(ii) operates in at least 2 counties.

(b) *Exclusions.*—This subtitle does not apply to:

(1) a unit in the Legislative Branch of the State government;

(2) a unit in the Judicial Branch of the State government;

(3) the Injured Workers' Insurance Fund;

(4) a board of license commissioners; or

(5) the Rural Maryland Council.

(Emphasis added.)

Appellees contend that the sections of the APA that deal with rule-making (S.G. § § 10–101–139) all apply to the Governor.[2] If appellees are right, then several significant conditions and requirements would have had to be met before Executive Order 01.01.2007.14 could become effective. Those conditions were summarized by Chief Judge Robert Murphy, speaking for the Court, in *Department of Health and Mental Hygiene v. Chimes, Inc.,* 343 Md. 336, 339–40, 681 A.2d 484 (1996):

---

**2.** Section 10–120–126 of the State Government Article constitutes part IV of subtitle 1 of the APA. Part IV is titled "Limited Provisions." Part IV plainly does not apply to the Governor because section 10–120(a)(1) specifically so states.

The APA requires *State agencies* to submit proposed regulations to the Attorney General for approval as to legality, § 10–107(b) of the State Government Article, and also to the Joint Committee on Administrative, Executive, and Legislative Review (AELR Committee) for preliminary review 15 days prior to publication. § 10–110(b). The *agency* must publish the proposed regulation in the Maryland Register and may adopt the regulation 45 days later. § 10–111(a)(1). For 30 out of the 45 days, the *agency* must accept public comment on the proposed regulation. § 10–111(a)(3). The AELR Committee may delay adoption of the regulation to allow more time for review. § 10–111(a)(2)(i). The AELR Committee considers whether the regulation is in conformity with the statutory authority of the *agency* and the legislative intent of the statute under which the regulation is promulgated. § 10–111.1(b). If the AELR Committee votes to oppose adoption of the regulation, the *agency* may withdraw or modify the regulation, or submit it to the Governor for approval. § 10–111.1(c)(2). The Governor may then order the *agency* to withdraw, modify, or adopt the regulation. § 10–111.1(c)(3). Notice of the adoption of the regulation must be printed in the Maryland Register. § 10–114. This process is commonly known as "notice and comment" rule-making.

The APA also provides for "Emergency Adoption" of regulations. If an *agency* deems it necessary, § 10–111(b)(1) allows immediate adoption of regulations by submitting the regulation and a fiscal impact statement to the AELR Committee. A majority of the AELR Committee or the chair or co-chair may approve the regulation. § 10–111(b)(2)(i). A public hearing must be held at the request of any member of the AELR Committee. § 10–111(b)(2)(ii)....

(Emphasis supplied.)

Although it is not determinative of the issue here presented, it is worth noting that the *Chimes* Court read the statute as meaning that subtitle 1 of the APA applied to agencies of the

Executive Branch.[3] The Governor is not an agency in the executive Branch-he is its head.

The legislative purpose of the APA was summarized in *Chimes, supra,* as follows:

In 1952, the Commission on Administrative Organization of the State, appointed by Governor McKeldin, recommended adoption of the 1946 Model State Administrative Procedure Act (MSAPA) "due to the end that administrative agencies may be subjected to essential controls but not unduly hampered in the performance of their functions." Seventh Report of the Commission on Administrative Organization of the State 70 (1952). That statute was designed to ensure that "certain basic principles of common sense, justice and fairness," including notice to interested parties, are applied in administrative procedures, *id.,* "without unduly restricting the agencies in the performance of their various tasks." *Id.* at 8; *see also* Maryland Code (1995 Repl.Vol., 1995 Supp.) § 10–201 of the State Government Article (declaration of policy); Commission to Revise the Administrative Procedure Act, Initial Report on Subtitles 2 and 4 of the APA 2 (1992). The Maryland Adminis-

---

**3.** Recently in *Washington Metropolitan Area Transit Authority v. Ruby Deschamps* 183 Md.App. 279, 298–99, 961 A.2d 591, 602–03 (2008) No. 1707, Sept. Term 2007 (filed December 3, 2008), the issue arose as to whether the Washington Metropolitan Area Transit Authority was a "unit" of the State as that term is used in the Maryland Tort Claims Act. We said:

Although the term "unit" is undefined in SG § 12–101 *et seq.,* and there is a dearth of authority directly on point, we note that the Court of Appeals has used language suggesting that units are indeed agencies. *See Evans v. State,* 396 Md. 256, 330, 914 A.2d 25 (2006) ("[W]e are dealing here with three agencies—the Department of Public Safety and Correctional Services (DPSCS), ... the [Department of Corrections], which is a unit within the DPSCS ..., and the Inmate Grievance Office (IGO), a unit that is also within DPSCS"); *Horridge v. St. Mary's County Dep't of Social Servs.,* 382 Md. 170, 174, 854 A.2d 1232 (2004) (describing a local department of social services as "a unit of the State Department of Human Resources and therefore a State agency"); *State v. Maryland Bd. of Contract Appeals,* 364 Md. 446, 456, 773 A.2d 504 (2001) (explaining that "[a]dministrative agencies like the Board of Contract Appeals ... are not inferior tribunals in relation to the circuit courts; rather they are independent

trative Procedure Act (APA), adopted by Ch. 94 of the Acts of 1957 and based on the MSAPA, therefore, sought to balance the State's interest in efficient administration against the individuals' interest in fairness. *Cf.* Bonfield, *State Administrative Rule-making* § 1.2.2 (1986 & Supp. 1993) (discussing the 1981 MSAPA); *Woodland Private Study Group v. State,* 109 N.J. 62, 533 A.2d 387, 393 (1987) (in determining whether the intra-agency statements exception from the New Jersey APA applies, the court focuses upon "whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected."); *see also Emma Ah Ho v. Cobb,* 62 Haw. 546, 617 P.2d 1208, 1213 (1980) (discussing the federal APA contracts exceptions).

343 Md. at 338, 681 A.2d 484 (emphasis added) (footnotes omitted).

While the appellees all contend that the circuit court was correct when it ruled that sections of the APA dealing with rule-making are applicable to the Governor of the State, they argue, in the alternative, that even if the APA is inapplicable, the Executive Order is invalid because that order "has no foundation in the Maryland Constitution or statutes." The MSFCC and its nine members also argue, but Delegate Smigiel and Senator Kittleman do not, that plaintiffs are likely to prevail for still another reason, i.e., because the Executive Order creates a mechanism for price fixing among independent child care providers and therefore violates federal laws prohibiting price-fixing. Appellants, not surprising, contend that all appellees' arguments are without merit and, as a consequence, there is no likelihood that plaintiffs will succeed on the merits.

## A.

### Applicability of the APA to the Governor

Governor O'Malley contends that, rather than being a unit *of* the Executive Branch, he is its head. *See* Maryland Constitution, Article II, section 1, which establishes the Gover-

---

units of the executive branch of state government"). Op. at 456, 966 A.2d at 510.

nor as the chief executive of the State. The appellees contend that Governor O'Malley is a "unit" in the Executive Branch.[4]

As mentioned earlier, for the rule-making sections of the APA to be here applicable, the Governor must be "an officer or unit authorized by law to adopt regulations." SG § 10–101(i). The Governor is not authorized by law to issue regulations as defined in section 10–101(g) regarding the POC Program.

As the appellees point out, there are sections of the Maryland Code that state that the Governor is allowed to issue "regulations" under certain limited circumstances. The "regulation" to which appellees direct our attention appears in the Public Safety Article of the Maryland Code. Those sections are: Section 13–211(a)(1) and (2) (the Governor may adopt regulations concerning issuance of service medals of appropriate designs to officers and enlisted individuals in the organized militia who have completed 5 years or more of continuance service); Section 13–213(a) ("The Governor may adopt regulations that provide for the retirement of officers and enlisted individuals" in the State militia); Section 13–502(a)(1) ("the Governor may adopt regulations to carry out this Title govern-

---

**4.** In a footnote to the Court's unanimous opinion in the *Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646 (1993), the Court of Appeals rejected the argument that the Governor's Redistricting Advisory Committee ("GRAC") was compelled to follow the dictates of the APA. The Court said:

[Petitioners] both assert that the GRAC was compelled to follow the requirements of the Administrative Procedure Act (APA), Maryland Code (1984, 1993 Repl.Vol.) 10–101 *et seq.* of the State Government Article, which specifies that notice must be published in the Maryland Register. This assertion is incorrect, because the APA applies only to Executive Branch "units," defined as "officer[s] or unit[s] authorized by law to adopt regulations." § 10–101(g). *Here, even assuming the redistricting plan was a "regulation," neither the GRAC nor the Governor was a "unit," for neither was authorized by law to adopt the plan;* rather, the plan became law only upon the General Assembly's inaction. Also, as the State points out, a statute such as the APA cannot control a constitutional gubernatorial function.

331 Md. at 574, 587 n. 11 (1993) (emphasis added).

The above quoted *dicta* suggests that in cases where the Governor is not authorized to pass a regulation (as opposed to an Executive Order), the Governor is not to be considered a "unit" of the Executive Branch.

ing the enlistment, organization, administration, equipment, maintenance, training, and discipline of the Maryland Defense Force"). Although referred to as "regulations" in the Public Safety Article, the "regulations" to which appellees refer are not "regulations" as defined in subtitle 1 of the APA. As noted earlier, the APA defines regulations so as not to include statements that concern only internal management of the unit that do not affect directly the rights of the public or procedure available to the public. *See* SG, § 10–101(g)(2)(i).

The legislative history of the APA gives no indication that the rule-making sections of the APA were intended to apply to the Governor, as opposed to agencies under his or her control. *See Chimes,* 343 Md. 336, 681 A.2d 484 (1996). And, as will be demonstrated, when other sections of subtitle 1 of the APA are read in tandem with the pertinent definition section (section 10–101(g) and (i)), of the APA, it becomes clear that subtitle 1 of the APA does not apply to the Governor.

Although there are other procedural steps necessary to pass a rule under the APA, some of the most important ones are set forth in SG § 10–111.1.

That section, as well as section 10–111 of the State Government Article, deal with the relationship between the "Promulgating unit" and the Joint Committee on Administrative, Executive and Legislative Review ("the Committee"), which is made up of members of the Maryland House of Delegates and the Senate.

**§ 10–111.1. Opposition to adoption.**

(a) *In general.*—(1) Prior to the expiration of any period of review granted to or reserved by the Committee pursuant to § 10–111(a) of this subtitle, the Committee, by a majority vote, may oppose the adoption of any proposed regulation.

(2) Unless waived by both of the presiding officers, at least 2 weeks prior to acting pursuant to subsection (a)(1) of this section with respect to any proposed regulation, the Committee shall notify the presiding officers, who shall notify the appropriate standing committees that the

special procedure established by this section may be exercised.

(b) *Factors considered.*—In its review of a proposed regulation pursuant to this section, the factors the Committee shall consider shall include whether the regulation:

(1) is in conformity with the statutory authority of the promulgating unit; and

(2) reasonably complies with the legislative intent of the statute under which the regulation was promulgated.

(c) *Notice to Governor and promulgating unit.*—(1) Within 5 working days after the Committee votes to oppose the adoption of a proposed regulation, it shall provide written notice to the Governor and the promulgating unit of its action.

(2) Upon receipt of such notice, and with written notice to the Committee and as otherwise required by law, the promulgating unit may:

(i) withdraw the regulation;

(ii) modify the regulation, but only in accordance with § 10–113 of this subtitle; or

(iii) submit the regulation to the Governor with a statement of the justification for the unit's refusal to withdraw or modify the regulation.

(3) Following the receipt of notice under paragraph (2)(iii) above, the Governor may consult with the Committee and the unit in an effort to resolve the conflict. After written notice has been provided to the presiding officers and to the Committee, the Governor may:

(i) instruct the unit to withdraw the regulation;

(ii) instruct the unit to modify the regulation, but only in accordance with § 10–113 of this subtitle; or

(iii) approve the adoption of the regulation.

(d) *Approval of Governor.*—A proposed regulation opposed by the Committee pursuant to this section may not be adopted, and is not effective unless approved, by the Governor pursuant to subsection (c)(3) of this section.

If section 10–111.1 were to be read to apply to the Governor, it would mean that if the Committee opposes one of the Governor's proposed "regulations," the Committee would be required to notify "the Governor *and* the promulgating unit within five days after it votes to oppose." The "promulgating unit" may then either: 1) withdraw the regulation; 2) modify it; or 3) send it to the Governor with a justification for its refusal to withdraw or modify the regulation. Read literally, this would mean that the Governor would have to send a letter to himself justifying his actions. Then the Governor would be required to either consult with the Committee or send himself a letter instructing himself to either withdraw or modify the regulation. Alternatively, the Governor could approve the adoption of his own regulation. This would all amount to a total waste of time and effort because no Governor would disapprove a regulation he (or she) proposed. Such a reading of the statute would produce an absurd result that must be avoided. *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000). In short, the language of section 10–111.1 shows that the "Promulgating unit" and the "Governor" can never be one and the same. This strongly suggests that the legislature did not intend the Governor to be covered by subtitle 1 of the APA.

Other sections of subtitle 1 of the APA likewise indicate that the rule-making sections of the APA were not intended to cover the Governor.

Section 10–133 of the State Government Article reads:

**Executive Order for review and evaluation of regulations.**

(a) *Duty of Governor to issue.*—Based on the schedules submitted by the adopting authorities under § 10–132.1 of this subtitle, the Governor shall, by an Executive Order consistent with this part, provide *for the review and evaluation of the regulations of each unit in accordance with this part.*

(b) *Review and evaluation every 8 years.*—The Executive Order shall provide that a *review and evaluation of the regulations of all units be undertaken every 8 years,* begin-

ning on July 1, 1995 and is repeated during each 8–year period thereafter.

(c) *Scheduling of evaluations.*—The Executive Order under subsection (b) of this section shall schedule the evaluations in such a manner that:

(1) a deadline is established for each unit to complete its evaluation; and

(2) the deadlines of the various units are staggered across the entire 8–year period.

(d) *Deadlines.*—(1) *The Executive Order shall provide that, on written request from a unit, the Governor may alter the deadline for that unit.*

(2) *If the Governor approves a request to alter a deadline, the unit shall notify the Committee.*

(Emphasis supplied.)

Once again the words of the statute indicate that the Governor is not a "unit as" that term is defined in SG § 10–101(2).

SG § 10–134 provides:

**Work Plan.**

(a) *Preparation.*—At least 1 year before the commencement of the review and evaluation of its regulations, each unit *shall prepare a work plan and submit the work plan to the Governor* and, subject to § 21–1246 of this article, the Committee.

(b) *Contents.*—The work plan shall:

(1) include a description of the procedures and methods to be used by the unit, which may include:

(i) procedures for inviting public comment, including:

1. the publication of notices in the Maryland Register;

2. the publication of notices in newspapers of general circulation in the State;

3. the posting of a notice on the unit's website or on a statewide website created for units to post notices of regulations review;

4. the mailing of notices; and

5. the holding of public hearings at various locations around the State;

(ii) procedures for ensuring the participation of stakeholders in the review process;

(iii) procedures for ensuring the participation in the review process of other units affected by the regulations; and

(iv) procedures for gathering and reviewing:

1. recent scientific information related to the regulations being reviewed;

2. similar regulations adopted or repealed by other states or the federal government; and

3. other appropriate information;

(2) identify the individual or individuals in the unit who will coordinate the evaluation and communicate with the Committee; and

(3) establish the schedule the unit will follow to complete its evaluation report in a timely manner.

(c) *Action by Committee.*—(1) Within 30 days after receipt of the work plan by the Committee, it shall:

(i) advise the unit in writing of any part of the work plan with which it disagrees;

(ii) submit to the unit in writing any changes it recommends to the work plan; and

(iii) in the event of a disagreement, attempt to meet with the head of the unit.

(2) The head of the unit and the Committee shall attempt to resolve any disagreements within 30 days after the Committee acts under this subsection.

If we were to interpret subtitle 1 of the APA to mean that the Governor is a "unit," the Governor would be required to submit a detailed work plan to himself at least one year prior to the review period mentioned in section 10–134. Once again, this would make no sense.

SG Art. Sec. 3–403 allows the Governor to set the effective date of his executive orders. SG Art. Sec. 10–117 sets the effective date of regulations at 10 days after notice of its adoption is published. These provisions would clash if an executive order had to be adopted as a regulation.

For all the above reasons, we hold that within the meaning of subtitle 1 of .the APA, the Governor is not a "unit." Therefore, any statement contained in his Executive Order is not a regulation, because it was not a statement "adopted by a unit." *See* SG § 10–101(g)(1)(iii).

Because we hold that subtitle 1 of the APA does not apply to the Governor, we conclude that the circuit court erred when it opined that the Executive Order was void because it was not issued in compliance with the requirements of the APA.

**B**

Appellees claim that even if the Governor did not have to follow the dictates of the APA, the Executive Order was nevertheless defective because it has no foundation in the Maryland Constitution or in any statute.

SG §§ 3–401–06 authorizes the Governor to issue Executive Orders under certain circumstances. An Executive Order is defined in SG § 3–401. as follows:

In this subtitle, "Executive Order" means an order or an amendment or rescission of an order that, over the signature of the Governor:

(1) proclaims or ends a state of emergency or exercises the authority of the Governor during an emergency, under Title 14, Subtitle 3 of the Public Safety Article or any other provision of law;

(2) adopts guidelines, rules of conduct, or rules of procedure for:

(i) State employees;

(ii) units of the State government; or

(iii) persons who are under the jurisdiction of those employees or units or who deal with them;

(3) establishes a unit, including an advisory unit, study unit, or task force; or

(4) changes the organization of the Executive Branch of the State government.

Section 3–302 of the State Government article provides: "The Governor is the head of the Executive Branch of the State government and, except as otherwise provided by law, shall supervise and direct the officers and units in that Branch."

When the Governor issued Executive Order 01.01.2007.14, he said in the "promulgation clause" that the Order was issued "by virtue of the authority vested in [the Governor] by the Constitution and laws of Maryland." *See Dept. of Public Safety and Correctional Services v. Beard,* 142 Md.App. 283, 297, 790 A.2d 57 (2002) (upholding the constitutional authority of the Governor to issue an Executive Order based on language in the promulgation clause coupled with the broad constitutional mandate granted to the Governor); *see also Lomax v. Warden, Maryland Correctional Training Center,* 120 Md.App. 314, 333 n. 8, 707 A.2d 395 (1998) (Executive Orders promulgated pursuant to Art. II, section 24 of the Maryland Constitution have the "force of law") (citing 64 Op. Att'y Gen. 180 (1979)).

The Executive Order here at issue fits squarely within the ambit of SG § 3–401(2)(i) and (iii). The Order provides guidelines for State employees (§ 3–401(2)(i)) in that it directs that any agreement reached between the Governor's designees and the representative of the designated provider organization be in writing. The Executive Order also "adopts ... rules of procedure" for persons "who deal with" State employees. SG, § 3–401(2)(iii). POC providers "deal with" the Office of Child Care when they are paid and are regulated under the POC program. *See* SG § 3–401(2)(iii).

POC providers are subject to State rules addressing matters including: who may provide care (COMAR 13A.14.06.06C), where the care may be provided (COMAR 13A.14.06.06C), the rate of compensation for child care (CO-

MAR 13A.14.06.06C and 11A–G), what days are paid for (COMAR 13A.14.06.11H(9)-(12)), the method for transmitting payments (COMAR 13A.14.06.06E, .11H(1), and .11I), the number of children who may be cared for by a given provider (COMAR 13A.14.06.06C), and what a POC provider must submit in order to be paid under the program (COMAR 13A.14.06.06D(4)).

When an Executive Order is issued, the Governor (and others) are required to meet procedural requirements far less onerous than those set forth in the APA. Insofar as Executive Orders are concerned, the major requirements set forth in the State Government Article are that: 1) the Governor deliver to the Secretary of State and to the State Archives a certified copy of the Executive Order (§ 3–404); 2) the Secretary of State in turn must deliver to the Administrator of the Division of State Documents and to the Department of Legislative Services two copies of the Executive Order (§ 3–405); and 3) the Executive Order must be published in the Code of Public General Laws (§ 3–406). But an Executive Order, unlike a regulation issued pursuant to subtitle 1 of the APA, does not have to undergo the often lengthy review process by the Joint Committee on Administration, Executive and Legislative review.

Appellees contend that by creating both a "bargaining unit" of private family child care providers and a procedure by which the "bargaining unit" chooses a single representative, the Executive Order "goes well beyond the areas of narrowly protected Gubernatorial activity" that other cases have allowed. Based on *McCulloch v. Glendening*, 347 Md. 272, 701 A.2d 99 (1997), we disagree.

In *McCulloch*, the issue presented was whether the Governor had the authority (constitutional or statutory) to issue Executive Order No. 01.01.1996.13 (entitled "Procedures for Labor–Management Relations in the Executive Branch of State Government"). About seven years later, in *Ehrlich v. State Employees Union*, 382 Md. 597, 599–600, 856 A.2d 669

(2004), the court summarized the pertinent facts in *McCulloch* as follows:

That Executive Order recognized the right of the Executive Branch employees to form or join employee organizations, bargain collectively, and engage in other concerted activities and, in furtherance of those rights, provided for the creation of appropriate bargaining units and the election and certification of exclusive bargaining representatives.

The only substantive provision regarding actual collective bargaining was in the section that defined the term "collective bargaining." That provision required the "employer" and the employee exclusive bargaining organization to negotiate in good faith with respect to wages, hours, and other terms and conditions of employment. It stated further that, upon completion of negotiations, the parties "shall execute a written memorandum of understanding incorporating the terms of any agreement reached, and, to the extent they require legislative approval or the appropriation of funds, such terms shall be recommended to the Legislature for approval or the appropriation of funds, as may be necessary." The term "employer" was not defined in the Executive Order. The order stated that the exclusive bargaining representative were entitled to meet and negotiate with the Governor or the Governor's designee in an effort to reach an agreement subject to the Governor's approval, and it enjoined "managerial and supervisory employees" from refusing to bargain collectively with the exclusive bargaining representatives. It did not, however, specify who, in particular was to sign any MOU [Memorandum of Understanding] on behalf of the State or any State agency.

In *McCulloch*, the validity of the Executive Order was challenged on several grounds, one of which was that there existed no legislative authorization for it. This challenge was rejected. 347 Md. at 287, 701 A.2d 99. The *McCulloch* Court held:

In this case, as we did in *[Maryland Classified Employees Ass'n v.] Schaefer*, [325 Md. 19 (1991)] we agree with the trial court that "Executive Order .01.01.1996.13 meets

Maryland constitutional and statutory requirements and is not in violation of the separation of powers." The Governor's broad authority, under Article 8 of the Maryland Declaration of Rights as well as sections 3–302 and 3–401 of the State Government Article, to issue Executive Orders *for the guidance and direction of units and employees of the Executive Branch necessarily permits the promulgation* of an Executive Order authorizing the limited collective-bargaining rights for Executive Branch employees contained in the subject Order. This act is an exercise of executive function, not a usurpation of legislative function.

*Id.* (emphasis added).

Part of the Executive Order at issue in this case, like the one at issue in *McCulloch,* deals with the direction by the Governor to officers who serve under him as to whom they should meet with and confer. Paragraph A of the Order here at issue directs the Secretary of the DLLR to receive petitions and conduct a representation election. Paragraph C contemplates the designation of executive branch officers to meet and confer with the elected provider representative. Like the order upheld in *McCulloch,* the Order here is within the Governor's authority with respect to the POC program to direct his own officers, by requiring them to identify a majority POC representative with whom the Governor's designees may meet and confer.

The Executive Order approved in McCulloch was far more comprehensive than the one here at issue. Executive Order 01.01.2007.14 does not set POC rates, it simply establishes a procedure by which POC representatives can organize and meet with the Governor's staff. But, by the explicit terms of the Order, no one else is prohibited from meeting with the Governor or his staff to discuss POC issues.

We hold that, like the Executive Order at issue in *McCulloch,* the Governor, in issuing Executive Order 01.01.2007.14, was simply exercising his executive prerogative and not usurping a legislative function.

## C

## Anti Trust Act

■ The MSFCCA claims that the Executive Order is invalid because it creates an illegal mechanism for fixing the prices independent child care providers can charge. According to the MSFCCA, the Executive Order violates federal antitrust law because "it permits independent child care providers to agree on the prices they would accept for their services." The circuit court rejected that argument, as do we. The fact that the POC program sets *reimbursement rates* in no way controls how much a provider can or will charge. Nothing in the program or in the Executive Order prevents any provider from charging customers more than the reimbursement rate. The Executive Order simply allows the bargaining unit to discuss with the Governor how much that reimbursement rate will be. Neither the Governor nor the bargaining unit sets the price for child care. Instead *if* the Governor and the bargaining unit reach an agreement, and *if* the General Assembly approves that rate, then the reimbursement rate is set. But not a single child care provider in Maryland is obliged to charge a customer the reimbursement rate. The Executive Order does not encourage or permit providers to "agree on price they would accept" and therefore the order does not violate the federal antitrust law.

## D

## Conclusion

Like the Executive Order discussed in *McCulloch*, the Order issued in this case was issued pursuant to the Governor's constitutional and statutory authority. The Governor did not violate subtitle 1 of the APA when he issued the Executive Order because those provisions do not apply to the Governor. Therefore, the case shall be remanded to the Circuit Court for Cecil County. Upon remand, the court shall issue a declaratory judgment in accordance with the views expressed in this opinion. Additionally, the court should deny the permanent injunction sought by appellees.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR CECIL COUNTY WITH INSTRUCTION TO ISSUE A DECLARATORY JUDGMENT IN ACCORDANCE WITH THE VIEWS EXPRESSED HEREIN; COSTS TO BE PAID BY APPELLEES.