# FAMILY LAW

## MARRIAGE – WHETHER OUT-OF-STATE SAME-SEX MARRIAGE THAT IS VALID IN THE STATE OF CELEBRATION MAY BE RECOGNIZED IN MARYLAND

February 23, 2010

*The Honorable Richard S. Madaleno, Jr.*
*Maryland Senate*

You asked whether the State may recognize same-sex marriages legally performed in other jurisdictions, including other countries. You also noted action taken by the Governor of New York in 2008 concerning recognition of out-of-state marriages and asked whether a Maryland Governor can issue an executive order concerning recognition of such marriages.

### *Same-Sex Marriages from Other Jurisdictions in Maryland*

This opinion does not concern whether individuals of the same sex may wed in Maryland. The General Assembly has clearly answered that question "no" – an answer that the Court of Appeals has found to be constitutional.

Rather, your inquiry raises the question whether the State may recognize a same-sex marriage *that is valid in the jurisdiction in which it was contracted*. Several states and foreign countries now provide for same-sex marriage under their own laws.

Although two individuals are married in another jurisdiction, their marital status in Maryland can become significant in a variety of ways. A same-sex couple validly married in another state or country may move to Maryland for employment. A same-sex couple validly married in another state or country may vacation in the State – or may stop temporarily in the State while traveling to another destination. A same-sex couple in Maryland may go to another state for the specific purpose of marrying under that state's law, and then return to Maryland. A same-sex couple married in another state may never set foot in Maryland, yet their marital status may have legal significance for others in Maryland.

3

You have asked whether those marriages *may* be recognized under State law. The answer to that question is clearly "yes."

*How the State May Recognize Such Marriages*

Such marriages may be recognized in several ways. First, legislation enacted by the General Assembly could provide for recognition of out-of-state same-sex marriages generally, or for particular purposes. Second, in the absence of legislation, the Court of Appeals, applying common law choice-of-law principles, could decide that such marriages will be recognized in Maryland, either generally or in particular circumstances. Finally, a State agency may also address the recognition of out-of-state marriages on particular matters within that agency's jurisdiction, so long as the agency's action is consistent with any relevant statutes and court decisions, including federal laws that may govern the agency's activities.

*Scope of this Opinion*

Because you have asked about the current state of the law concerning recognition of out-of-state marriages, this opinion addresses the second way in which out-of-state marriages may be recognized in Maryland. It describes the legal landscape against which the Court of Appeals would assess the question of recognition of an out-of-state same-sex marriage and our view of how it would likely resolve this issue.[1] This opinion does not discuss the mechanics of passing legislation or the particular laws that govern the actions of specific agencies.

---

[1] An Attorney General opinion is not itself the law of Maryland in the same sense as a statute enacted by the Legislature or court decision elaborating the common law or construing a statute. Rather it is an interpretation of the statutory or common law that can guide a client agency and may be persuasive to a court reviewing agency action based on the opinion. *See, e.g., Brown v. Handgun Permit Review Board*, 188 Md. App. 455, 982 A.2d 830 (2009) (upholding Board decisions predicated in part on legal conclusions stated in Attorney General opinion). Thus, what we say in this opinion is a prediction, not a prescription, as to the how the Court would approach this issue under current law.

We are aware that many have strong views on what the answers *should be* concerning recognition of same-sex marriages.[2] Personal policy views do not dictate the answer to the question you have posed. One could favor, as a matter of policy, the extension of marriage under Maryland law to same-sex couples, but concede that valid out-of-state unions may not be recognized under current law. Conversely, one could oppose, as a matter of policy, the extension of marriage to same-sex couples in the State, but acknowledge that unions contracted validly under the laws of other states must be respected.

To answer your question, we must put aside personal policy views concerning same-sex marriage and focus on how the Court of Appeals would apply choice-of-law rules about out-of-state marriages. Choice-of-law, or conflict-of-laws, is the body of common law that the courts apply when the laws of more than one jurisdiction potentially govern a particular situation. In regard to out-of-state marriages the courts apply the principle of comity, a term that describes the respect that one state has for the laws of another in light of its own public policy.

*Out-of-State Marriages and the Principle of Comity*

The Court of Appeals would start from the general principle that a marriage that is valid in the place of celebration remains valid in Maryland. There is an exception to that rule if the particular marriage is contrary to a strong State public policy. A statute that limits marriage in Maryland to opposite-sex couples could be said to embody a policy against same-sex marriage. However, there are many restrictions in the State's marriage statutes and the Court of Appeals has not construed the public policy exception to encompass all those restrictions. For example, it has recognized common law marriages from other states, although there is no common law marriage in Maryland, and has recognized a Rhode Island marriage between an uncle and a niece, although a statute prohibits marriage

---

[2] You originally requested that this advice be provided on a confidential basis, but subsequently withdrew that request. In accordance with our usual procedure for official opinions, we posted the opinion request on our website in the event interested parties wished to submit legal memoranda or information relevant to the request. We received several memoranda and other submissions, which we carefully considered in preparing this opinion.

between an uncle and a niece in Maryland.  Indeed, the public policy exception is a very limited one that the Court has seldom invoked.

While the matter is not free from all doubt, in our view, the Court is likely to respect the law of other states and recognize a same-sex marriage contracted validly in another jurisdiction. In light of Maryland's developing public policy concerning intimate same-sex relationships, the Court would not readily invoke the public policy exception to the usual rule of recognition.  You have posed the question in the abstract, but, of course, context matters.  For example, to the extent that a particular matter is governed by federal law, the federal Defense of Marriage Act, which limits marriage for federal purposes to opposite-sex couples, would prevent recognition of the marriage for that particular purpose.[3]

*Executive Orders*

Finally, with respect to your question concerning the Governor's authority to issue an executive order, the Governor cannot legislate through an executive order.  An executive order of the Governor must be consistent with existing Maryland law, as enacted by the General Assembly and construed by the courts. While the State Constitution and statutes accord the Governor broad powers in certain areas – for example, in matters concerning executive branch employees – many questions concerning recognition of out-of-state marriages arise in the courts and cannot be addressed in an executive order.  The action of the New York Governor's office in 2008 is not entirely analogous.  In New York, the Governor's counsel issued a memorandum to various agencies in that state directing them to comply with a state court decision

---

[3] An advice letter of this Office written six years ago gave a qualified answer that out-of-state same-sex marriages would likely not be recognized under Maryland law.  While we reach a different conclusion today, in light of developments in the law concerning intimate same-sex relationships, we realize that State agencies have relied on that advice in setting agency policies concerning recognition of out-of-state marriages. In the absence of legislation or a definitive opinion of the Court of Appeals, a State agency that intends to change its existing policy concerning recognition of out-of-state same-sex marriages should first adopt any necessary regulations and conduct any appropriate deliberative process that permits consideration of the particular circumstances to which the agency's policy will apply and consider the possible applicability of federal law to those circumstances.

concerning recognition of out-of-state marriages; there is no similar court decision in Maryland.

## I

### Availability of Same-Sex Marriage in Other Jurisdictions

The laws of several jurisdictions allow for same-sex marriage. In the United States, a same-sex couple may currently marry under the laws of four New England states and Iowa.[4] In addition, a same-sex marriage contracted in California prior to a recent amendment of that state's constitution to ban same-sex marriage remains valid under California law. *Strauss v. Horton*, 207 P.3d 48 (Cal. 2009). The District of Columbia has enacted a bill, subject to congressional review, that would authorize same-sex marriage in that jurisdiction beginning in the spring of 2010. D.C. Law 18-9 (Jury and Marriage Amendment Act of 2009); *see* T. Craig, *Message appended to marriage bill*, Washington Post (December 19, 2009), p. B1. Finally, a number of foreign countries have also authorized same-sex marriage.[5]

## II

### Marriage under Maryland Law

#### A.    *Regulation by Common law and Statutes*

Since Maryland's origin as a British colony, marriage has been recognized as a civil contract subject to significant regulation.[6]

---

[4]    *See* 15 Vt. Stat. Ann. §8; N.H. Rev. Stat. Ann. §457:1-a*; Goodridge v. Dep't of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941 (2003); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009).

[5] We understand that such marriages are currently authorized in Belgium, Canada, the Netherlands, Norway, South Africa, Spain, and Sweden.

[6] Maryland has adopted the common law of England as of July 4, 1776, subject to modification by the General Assembly, development by

(continued...)

Early laws required a ceremony and specified the content – at one time the liturgy of the Church of England, but later broadened to encompass other faiths and ultimately to dispense with the requirement that the ceremony be religious in nature.[7] While that regulation was originally based on the canon and civil law of England, it is now subject to the "plenary" authority of the General Assembly. *See Harrison v. State*, 22 Md. 468, 493 (1864).

State law continues to regulate the manner by which individuals can get married in a number of ways. They must obtain a license from the clerk of the county's circuit court. Annotated Code of Maryland, Family Law Article ("FL"), §2-401. The clerk is to withhold the license if aware of a legal reason why the applicants may not marry, and there is ordinarily a brief waiting period before a license becomes effective. FL §2-405(d), (e). The marriage must be solemnized in a ceremony performed by an authorized person. FL §2-406; *Henderson v. Henderson*, 199 Md. 449, 454, 87 A.2d 403 (1952). The ceremony is to be documented by a marriage certificate. FL §2-409. These statutory requirements are designed "to discourage deception and seduction, to prevent illicit intercourse under the guise of matrimony, to relieve from doubt the status of parties who live together as man and wife, and to furnish evidence of the status and legitimacy of any offspring." *Henderson*, 199 Md. at 455.

State law also regulates who may marry within the State. It sets a minimum age for the parties, FL §2-301, limits how closely those individuals may be related, FL §2-202, and restricts the institution to monogamous heterosexual relationships. FL §2-201. We discuss the last element in greater detail in the next section.

---

[6] (...continued)
the State courts, and provisions of the State and federal constitutions. *See* Maryland Constitution, Declaration of Rights, Article 5.

[7] *See, e.g.,* Chapter 72, Acts of the General Assembly 1704 (requiring person presiding at wedding to use Liturgy of the Church of England); Chapter 12, Laws of Maryland 1777 (specifying that marriage ceremony may be performed by officials of various religions listed in statute); Chapter 406, Laws of Maryland 1963 (eliminating requirement of religious ceremony).

### B. *Same-Sex Marriage in Maryland*

#### 1. Family Law Article, §2-201

For many years, it has been well established that, under Maryland law, a marriage is between one man and one woman. 57 *Opinions of the Attorney General* 71 (1972). The General Assembly codified that understanding in 1973. Chapter 213, Laws of Maryland 1973, *then codified at* Annotated Code of Maryland, Article 62, §1. That provision states:

> Only a marriage between a man and a woman
> is valid in this State.

FL §2-201. Since 1973, the Legislature has declined to broaden or narrow this language[8] and has reaffirmed its sentiment in other enactments. For example, in 2001, as part of a bill adding certain anti-discrimination measures relating to sexual orientation to the State's human relations law, the Legislature enacted a provision stating that those anti-discrimination measures "may not be construed to authorize or validate a marriage between two individuals of the same sex." Chapter 340, §2(1), Laws of Maryland 2001;[9] *see also Maryland Commission on Human Relations v. Greenbelt Homes, Inc.*, 300 Md. 75, 83-84, 475 A.2d 1192 (1984) ("The law of Maryland does not recognize ... relationships of homosexuals or lesbians as legally bestowing upon two people a legally cognizable marital status") *quoting Prince George's County v. Greenbelt Homes, Inc*, 49 Md. App. 314, 431 A.2d 745 (1981). The constitutionality of FL §2-201 was recently upheld by the Court of Appeals. *Conaway v. Deane*, 401 Md. 219, 932 A.2d 571 (2007).

---

[8] *See* Part V.C. below.

[9] The codified portion of Chapter 340 was recently recodified as part of the State Government Article in a non-substantive code revision bill. Chapter 120, Laws of Maryland 2009. This non-substantive revision did not, of course, affect the uncodified provision quoted in the text. *See id*, §3. As we have suggested in other contexts, to avoid confusion and to comply with a directory provision of the State Constitution, we recommend that the Legislature either codify or repeal such provisions. *See* 85 *Opinions of the Attorney General* 190, 195 (2000).

### 2. *Conaway v. Deane*

In *Deane,* the Court of Appeals held that FL§2-201 does not violate the Maryland Equal Rights Amendment[10] or the Maryland constitutional provision that guarantees equal protection and substantive due process of law.[11] The majority opinion held that the statute was subject to rational basis review and that the statute was plausibly related to the State's interest in promoting procreation. The majority acknowledged that the "legal landscape surrounding the rights of homosexual persons is evolving," with the trend toward recognizing additional rights and protections. 401 Md. at 308-9.[12] It also cautioned that its holdings did not diminish the authority of the General Assembly to "grant and recognize for homosexual persons civil unions or the right to marry a person of the same sex." *Id*. at 325. The Court did not address the question of recognition of out-of-state same-sex marriages.

In a footnote, the Court stated that "the State of Maryland may not be compelled to recognize a marriage performed in another state if that foreign marriage is repugnant to Maryland's public policy" as an example of the "vital principle" that marriage is subject to the police power of the State. *Deane*, 401 Md. at 304 n. 66. However, the Court did not analyze whether recognition of a foreign same-sex marriage would be repugnant to Maryland's public policy.[13]

---

[10] Maryland Declaration of Rights, Article 46.

[11] Maryland Declaration of Rights, Article 24.

[12] In a concurring and dissenting opinion, Judge Raker drew a distinction between the right to marry and an entitlement to the rights of marriage. 401 Md. at 326. In her opinion, she catalogued the many benefits that marriage confers on married persons by operation of law. *Id*. at 343-46. She concluded that the State had not demonstrated a rational relationship between the State interest in procreation and stable child-rearing and the denial of the benefits and privileges of marriage to same-sex couples. *Id*. at 352. She would have held that the General Assembly was required to craft at least a civil union or domestic partnership statute. *Id*. at 352-53. Two dissenting judges argued that the strict scrutiny standard under the Equal Rights Amendment should have been applied and would have remanded the case to the trial court for further factual development. *Id*. at 356, 421.

[13] The Court noted that the case that it cited for this proposition had
(continued...)

## C.    *Recognition of Out-of-State Marriages in Maryland*

There are no formal prerequisites to recognition of an out-of-state marriage.[14] Maryland courts observe "the general rule that a marriage valid where contracted or solemnized is valid everywhere, unless it is contrary to the public policy of the forum." *Henderson*, 199 Md. at 458. This is often referred to as the principle of comity. The Court of Appeals has explained the rationale for this rule:

> The reason for this rule is that it is desirable that there should be uniformity in the recognition of the marital status, so that persons legally married according to the laws of one State will not be held to be living in adultery in another State, and that children

---

[13] (...continued)
been "discredited" for the particular application of that principle that it had offered – whether to recognize an interracial marriage. *See Henderson v. Henderson*, 199 Md. 449, 459, 87 A.2d 403 (1952) (stating that an interracial marriage would not be recognized in Maryland, even if valid elsewhere).

In other portions of its opinion, the *Deane* majority cited favorably two cases in which a court declined to recognize a valid same-sex marriage from another jurisdiction – *Wilson v. Ake*, 354 F.Supp.2d 1298 (M.D. Fla. 2005) and *In re Kandu*, 315 B.R. 123 (W.D. Wash. 2004). *See Deane*, 401 Md. at 270-71, 279-81, 294, 313. However, those references concerned whether homosexuality is a suspect class and whether there is a fundamental right to same-sex marriage that would trigger strict scrutiny review. Those references do not appear to augur how the Court of Appeals would resolve the question you have posed.

[14] Each circuit court has a "foreign marriage" record book in which a certificate of an out-of-state marriage signed by the celebrant or a certified copy of a record of such a marriage may be recorded. FL §2-502. The statute defines a "foreign marriage" as one performed outside Maryland in which one or both parties "were or are citizens of [Maryland]." FL §2-502(a). However, the statute does not make recordation of an out-of-state marriage a prerequisite to its recognition in Maryland. Nor would a clerk's ministerial action in recording a certificate be conclusive as to whether the particular marriage is recognized in the State. The foreign marriage book was apparently created as a convenience to parties who desired to have an official record in Maryland of their out-of-state marriage. *See* Chapter 69, Laws of Maryland 1912; *see also* Annotated Code of Maryland (1924), Article 62, §§9, 17.

> begotten in lawful wedlock in one State will
> not be held illegitimate in another.

*Id*. This rule is similar to that followed by many other states. *See* 52 Am. Jur. 2d *Marriage* §63 (2000 & 2009 Cum. Supp.); Grossman, *Resurrecting Comity: Revisiting the Problem of Non-Uniform Marriage Laws*, 84 Or. L. Rev. 433, 460-61 (2005).[15] As noted in *Deane*, this rule is subject to a "public policy" exception.

We shall discuss in greater detail the application of the principle of comity under Maryland law to an out-of-state same-sex marriage. However, we shall first review the possible impact of federal law, and survey the answers developed in other states to similar questions.

---

[15] The First Restatement expresses a similar rule with somewhat more emphasis on the public policy of the state(s) where the parties are domiciled. *See* Restatement (First), Conflict of Laws, §§121, 131, 132. The Second Restatement expresses a further variation on this rule:

> (1) The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage under [general choice of law principles].
>
> (2) A marriage which satisfies the requirements of the state where the marriage was contracted will everywhere be recognized as valid unless it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage.

Restatement (Second), Conflict of Laws, §283. *See generally* Grossman, *supra*, 84 Or. L. Rev. at 472-77 (comparing Restatement versions). Despite the growing acceptance of the "most significant relationship" standard of the Second Restatement, Maryland courts have adhered to an older standard, sometimes referred to as *lex loci contractus* ("law of the place of the contract"), on choice of law issues concerning other forms of contract, as well as marriage. *See American Motorists Insurance Co. v. ARTRA Group, Inc.*, 338 Md. 560, 659 A.2d 1295 (1995).

## III

### Federal Law Affecting Recognition
### of Out-of-State Marriages

The Full Faith and Credit Clause of the federal Constitution and a federal law known as the Defense of Marriage Act both potentially affect a state's recognition of out-of-state marriages.

### A.    *Full Faith and Credit Clause*

The Full Faith and Credit Clause of the United States Constitution states:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof.

United States Constitution, Article IV, §1; *see also* 28 U.S.C. §1738 (full faith and credit for legislative acts and judicial proceedings). The Full Faith and Credit Clause clearly requires one state to respect a judgment rendered by a court of another state. *Nevada v. Hall*, 440 U.S. 410, 421 (1979).  However, the constitutional provision does not require a state to recognize or apply another state's laws if doing so would run contrary to its own "legitimate public policy." *Id*. at 422.  Thus, the Full Faith and Credit Clause would not dictate that one state recognize and abide by the legislative judgments of another state concerning the validity of a marriage if doing so would be contrary to its own public policy.[16]

### B.    *Federal Defense of Marriage Act*

In the mid-1990s, Congress enacted the federal Defense of Marriage Act in reaction to the possibility that a state might

---

[16] While a state's decision whether to issue a marriage license is not entitled to the highest level of protection under the Full Faith and Credit Clause, the dissolution of a marriage – a divorce – is a judgment that receives special respect under that provision. *See Williams v. North Carolina*, 317 U.S. 287 (1942).

authorize same-sex marriage. *See* Pub. L. 104-199, 110 Stat. 2419 (September 21, 1996). That law addressed interstate recognition of same-sex marriages and also established a general definition of marriage – restricted to heterosexual couples – for purposes of federal law.

### 1. Interstate Recognition of Same-Sex Marriages

With respect to effect of federal law on interstate recognition of same-sex marriages the federal Defense of Marriage Act provides:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any State, territory, possession or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

28 U.S.C. §1738C. In other words, there is no mandate under federal law for one state to recognize a same-sex marriage formed in another state. This provision has been held to be constitutional by a federal district court. *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1303 (M.D. Fla 2005) (rejecting constitutional challenges to Defense of Marriage Act and holding that Florida was not required to recognize Massachusetts same-sex marriage because it would conflict with Florida's public policy opposing same-sex marriage).

### 2. Definition of "Marriage" under Federal Law

The Defense of Marriage Act also created definitions of "marriage" and "spouse" for purposes of federal law:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. §7. The courts have rejected constitutional challenges to this provision.[17] *In re Kandu*, 315 B.R. 123 (W.D.Wash. 2004) (rejecting constitutional challenges to Defense of Marriage Act and holding that same-sex couple could not file joint bankruptcy petition); *Bishop v. Oklahoma*, 447 F. Supp. 2d 1239 (N.D. Okla. 2006), *rev'd in part on other grounds,* 333 Fed. Appx. 361 (10th Cir. 2009).

This definition does not directly concern one state's recognition of a same-sex marriage from another state under state law. However, to the extent that a state law is linked to a federal law or regulation, the federal definition of marriage may affect whether or how an out-of-state same-sex marriage is recognized for purposes of state law.

### C.    *Summary*

There is no requirement under federal law that the Maryland courts recognize out-of-state same-sex marriages. Nor is there any general federal prohibition against recognition of such marriages. The federal constitution expresses a general principle that legal acts recognized in one state will be respected by other states, subject to a public policy exception, similar to the common law principle of comity. The Defense of Marriage Act provides that one state need not recognize a same-sex relationship established in another state as a marriage and thus essentially defers to state law on that question. That Act also limits marriage to heterosexual couples for federal purposes and thus may affect recognition of out-of-state same-sex marriages when Maryland law is linked to federal law.

---

[17] Massachusetts has challenged the constitutionality of this provision, arguing that it interferes with the state's sovereign authority to define marriage and requires that state to treat same-sex couples married under Massachusetts law differently from married heterosexual couples. The case is pending in federal district court. *Massachusetts v. Department of Health and Human Services, et al.*, Civil No. 1:09-11156 JLT.

# IV

## Recognition of Out-of-State Same-Sex Marriages by Other States

Your questions concern Maryland law. However, the same questions have arisen in other states and the answers provided in those jurisdictions are instructive, although not controlling, with respect to the answer in Maryland.

Although recognition of out-of-state marriages has long been a staple of choice-of-law treatises and case law, there was scant discussion of the recognition of same-sex marriages prior to the mid-1990s for the obvious reason that no state allowed such a marriage.[18] The question whether a state, such as Maryland, that would not issue a marriage license for a same-sex marriage, would recognize such a marriage solemnized in another state became the subject of discussion in the mid-1990s after a widely publicized decision of the Hawaii Supreme Court. *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993). In that case, a plurality of the court concluded that a statutory limitation of marriage to heterosexual couples in Hawaii presumptively violated the equal protection provision of the state constitution; the court remanded the case to give the state an opportunity to demonstrate a compelling interest for limiting marriage to heterosexual couples. This led to speculation that same-sex couples from around the country would soon be able to marry in Hawaii and seek to have their unions recognized in their home states. *See, e.g.,* Hovermill, *A Conflict of Law and Morals: The Choice of Law Implications of Hawaii's Recognition of Same-Sex Marriages*, 53 Md. L. Rev. 450 (1994); Note, *In Sickness and in Health, In Hawaii and Where Else?: Conflict of Laws and Recognition of Same-Sex Marriages*, 109 Harv. L. Rev. 2038 (1996).

---

[18] A 1995 survey reported that no state or foreign country allowed same-sex marriage at that time. Wardle, *International Marriage and Divorce Regulation and Recognition: A Survey,* 29 Fam. L. Q. 497, 500 (1995). Even then, a treatise on conflict of laws observed that "[t]he asserted rule that no recognition will be given to foreign marriages which are not monogamous unions of one man and one woman for life can no longer be accepted." Scoles & Hay, Conflict of Laws (1984) at p. 441. The treatise did not discuss recognition of same-sex marriages, but did devote a number of pages to the possible recognition, at least for some purposes, of foreign polygamous marriages that are valid in the jurisdiction where contracted.

In reaction to *Baehr*, Congress passed the federal Defense of Marriage Act[19] and various states enacted similar state provisions, presumably in anticipation of Hawaiian same-sex marriages. However, that consequence did not materialize as the Hawaii constitution was amended to authorize the state legislature to reserve marriage for opposite-sex couples and the legislature later passed a statute to that effect. Hawaii Constitution, Article I, §23; Haw. Rev. Stat. §572-1. Accordingly, the question whether a state would be called upon to recognize a same-sex marriage contracted in another state again became an academic question.

The issue began to receive greater attention again in 2003 when the Massachusetts Supreme Judicial Court ruled that the limitation of marriage to opposite-sex couples violated the equal protection guarantee of the Massachusetts constitution. *See Goodridge v. Dept. of Public Health*, 798 N.E.2d 941, 969 (Mass. 2003); *see also Opinion of the Justices*, 802 N.E.2d 565, 571 (Mass. 2004). Additional state statutes and constitutional provisions precluding recognition of out-of-state same-sex marriages were enacted in reaction to the Massachusetts decision.

*Baehr*, *Goodridge*, the Defense of Marriage Act, and the various state statutes and constitutional provisions passed in reaction to them, have spawned an ever-growing body of academic commentary exploring their choice-of-law ramifications with respect to same-sex marriages. *See, e.g.,* Yarwood, *Breaking Up is Hard to Do: Mini-DOMA States, Migratory Same-Sex Marriage, Divorce, and a Practical Solution to Property Division*, 89 B.U. L .Rev. 1355 (2009);Wolff, *Interest Analysis in Interjurisdictional Marriage Disputes*, 153 U. Penn. L. Rev. 2215 (2005); Koppelman, *Interstate Recognition of Same-Sex Marriages and Civil Unions: A Handbook for Judges*, 153 U. Penn. L. Rev. 2143 (2005); Grossman, *Resurrecting Comity: Revisiting the Problem of Non-Uniform Marriage Laws*, 84 Or. L. Rev. 433 (2005).

The legal landscape with respect to recognition of out-of-state same-sex marriages is a patchwork. Only a few states have statutes similar to FL §2-201 – *i.e.*, that prohibit same-sex marriage, but that do not explicitly address out-of-state marriages. Most states have statutes that specifically prohibit same-sex marriage as well as recognition of such marriages celebrated in other jurisdictions. The few states that have authorized same-sex marriage presumably will

---

[19] See Part III.B. above.

recognize a same-sex marriage that is valid in another jurisdiction. A small number of states do not allow for same-sex marriage under their own laws, but have not explicitly barred recognition of such marriages from other jurisdictions by statute. Each group of states is discussed below.

### A. States with Statutes Similar to FL §2-201

There are very few marriage statutes in the United States that read similarly to FL §2-201. From our review, the only states that currently have statutes with arguably similar language are Iowa ("Only a marriage between a male and a female is valid")[20] and Wyoming ("Marriage is a civil contract between a male and a female person to which the consent of the parties capable of contracting is essential").[21] Recently, the Iowa Supreme Court held that the Iowa statute violated that state's constitution,[22] without specifically construing the statute's effect on recognition of out-of-state marriages. *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009). We are not aware of any case law in Iowa or Wyoming that concerns whether such a statute bars recognition of valid out-of-state same-sex marriages. Therefore, we can draw little insight into the meaning of FL §2-201 from those parallel laws.[23]

---

[20] Iowa Code Ann. §595.2.

[21] Wyo. Stat. Ann. §20-1-101.

[22] As indicated in Part II.B. above, the Court of Appeals of Maryland reached the opposite conclusion with respect to FL §2-201.

[23] As of early 1996, the North Carolina marriage statute contained somewhat similar language: "The consent of a male and female person who may lawfully marry ... shall be a valid and sufficient marriage..." N.C.G.S. §51-1 (1996). The North Carolina Attorney General opined that North Carolina could decline to recognize out-of-state same-sex marriages, based upon that statute. *Opinion of the North Carolina Attorney General*, 1996 WL 925102 (May 14, 1996). However, shortly thereafter, the North Carolina legislature amended the state marriage law to explicitly deny recognition of such marriages. *See* N.C.G.S. §51-1.2 ("Marriages ... performed outside of North Carolina between individuals of the same gender are not valid in North Carolina").

## B. *States with Laws that Prohibit Recognition*

In a large majority of states – approximately 40 – the issue of recognition has been resolved by constitutional amendments or legislative enactments that explicitly bar recognition of out-of-state same-sex marriages. *See, e.g.*, Del. Code Ann. Tit. 13, §101(d) ("A marriage obtained or recognized outside the State between persons [of the same gender] shall not constitute a legal or valid marriage within the State."); Kan. Stat. Ann. §23-115 ("It is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman"); 23 Pa. Cons. Stat. Ann. §1704 ("A marriage between persons of the same sex which was entered into in another state or foreign jurisdiction, even if valid where entered into, shall be void in this Commonwealth"); Va. Code Ann. §20-45.2 ("Any marriage entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created by such marriage shall be void and unenforceable"); W.Va. Code Ann. §48-2-603 ("A public act ...of any other state ... respecting a relationship between persons of the same sex that is treated as marriage under the laws of the other state ... shall not be given effect by this state"); *see generally* Koppelman, *supra*, 153 U. Penn. L. Rev. at 2165-94 (2005) (compiling state laws concerning recognition of out-of-state same-sex marriages).[24] Many of these laws were enacted in reaction to either the *Baehr* or the *Goodridge* decisions.

To date, provisions prohibiting recognition of out-of-state same-sex marriages have been upheld against federal constitutional challenge. *See Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006) (upholding Nebraska constitutional provision that precludes recognition of out-of-state same-sex marriages); *Wilson v. Ake*, 354 F. Supp.2d 1298 (M.D. Fla. 2005) (holding that Florida statute precluding recognition of out-of-state same-sex marriages is constitutional and upholding refusal of Florida officials to recognize Massachusetts same-sex marriage).

---

[24] An appendix to the Koppelman article surveyed the state laws concerning recognition of out-of-state same-sex marriages shortly after the *Goodridge* decision. Approximately 37 states had statutory or constitutional provisions that clearly barred recognition of out-of-state same-sex marriages. Since that time, Wisconsin and South Dakota have enacted constitutional provisions for that purpose. Wisconsin Constitution, Article 13, §13; South Dakota Constitution, Article XXI, §9. In addition, some of the states with statutory prohibitions against recognition have added constitutional provisions to the same effect.

Unsurprisingly, when the question of recognition of an out-of-state same-sex marriage has arisen in such a state, Attorneys General in those states have concluded that the state would decline to recognize such marriages. *See, e.g., Opinion of the Michigan Attorney General* No. 7160, 2004 WL 2096457 (September 14, 2004) (Massachusetts same-sex marriage would not be recognized in Michigan); *Opinion of the Louisiana Attorney General*, No. 06-0325, 2007 WL 1438453 (April 18, 2007) (Louisiana not required to recognize adoption by same-sex couple in a state that permits same-sex marriages); *Opinion of the Idaho Attorney General* No. 06-1, 2006 WL 467700 (February 8, 2006) at *8 (Full Faith and Credit Clause would not require Idaho to recognize same-sex marriage contrary to public policy expressed in its statute); *Opinion of the Alabama Attorney General* 2000-129, 2000 WL 33310632 (April 20, 2000) (Alabama not required to recognize Vermont same-sex civil union). Nevertheless, there may be circumstances in which a court in such a state may accord some effect, however indirect, to an out-of-state same-sex union.[25]

## C.  *States That Allow Same-Sex Marriage*

The states that permit same-sex marriage under their own laws presumably would ordinarily recognize a same-sex marriage validly contracted under the laws of another state. For example, after the Connecticut Supreme Court held that the state's ban on same-sex marriage violated equal protection rights under that state's constitution, *Kerrigan v. Commissioner of Public Health*, 957 A.2d 407 (Conn. 2008), the Connecticut Attorney General opined that out-of-state same-sex marriages would be recognized in Connecticut.

---

[25] An example is *Miller-Jenkins v.Miller-Jenkins*, 637 S.E.2d 330 (Va. App. 2006). In that case, two women had entered into a civil union under Vermont law and one of the women had a child as a result of artificial insemination. The woman who had given birth later sought to dissolve the civil union in a Vermont court, which issued a temporary order concerning custody and visitation. In the meantime, she had moved to Virginia with the child where she sought a declaratory judgment that she was the sole parent. The Virginia Court of Appeals held that the trial court was obligated to give full faith and credit to the Vermont custody and visitation order pursuant to the federal Parental Kidnapping Prevention Act; the court stated that it was not addressing recognition of the Vermont civil union under Virginia law. The Virginia Supreme Court later affirmed the Court of Appeals decision on procedural grounds without reaching the substantive issue. *Miller-Jenkins v. Miller-Jenkins*, 661 S.E.2d 822 (Va. 2008).

*Opinion of the Connecticut Attorney General* No. 2008-019, 2008 WL 4760988 (October 28, 2008) at *1.[26]

#### D. *States Without a Statute Allowing or Proscribing Same-Sex Marriage*

Four states – Rhode Island, New Jersey, New Mexico, and New York – have no statute that specifically precludes same-sex unions or that explicitly addresses recognition of out-of-state same-sex marriages, although all currently do not issue licenses for same-sex marriages. Recently, there has been substantial attention in three of those states to the question of recognition of same-sex marriages validly contracted in another jurisdiction, perhaps driven by the relative proximity of those three states to Massachusetts.

#### 1. Rhode Island

*Attorney General opinions*

In 2004, the Rhode Island Attorney General opined that a party to a valid same-sex marriage in Massachusetts would be eligible to receive "spouse's benefits" under a Rhode Island statute concerning teacher retirement benefits. Letter of Rhode Island Attorney General Patrick C. Lynch to General Treasurer Paul J. Tavares (October 19, 2004).[27] The brief opinion was based on the gender-neutral definition of "spouse" in the retirement statute.

---

[26] Prior to that decision, the Connecticut Attorney General had opined that "same-sex marriages performed under laws of any other State violate Connecticut's expressly articulated public policy and are not required by the Full Faith and Credit Clause of the United States Constitution to be recognized here." *Opinion of the Connecticut Attorney General* No. 2005-024, 2005 WL 2293060 (September 20, 2005) at *1. However, the Attorney General also concluded that a same-sex couple married under the laws of another state could obtain a civil union under Connecticut law. *Id.* At that time, Connecticut law stated: "The General Assembly finds that ... the current public policy of the state of Connecticut is now limited to a marriage between a man and a woman." Conn. Gen. State. Ann. §45a-727a(4). The Connecticut legislature deleted that provision from its code in 2009.

[27] The two Rhode Island Attorney General opinions discussed here are apparently not available through Westlaw.

In 2007, the Rhode Island Attorney General reached a similar conclusion and elaborated on the justification for recognizing Massachusetts same-sex marriages in an opinion concerning whether Rhode Island's higher education agency should treat an employee who is a party to such a marriage as a married person. Letter of Rhode Island Attorney General Patrick C. Lynch to Commissioner Jack R. Warner (February 20, 2007). The Rhode Island Attorney General reasoned that the answer to that question depended, under both the Full Faith and Credit Clause and common law comity principles, on whether recognition would be contrary to the public policy of Rhode Island. He noted that Rhode Island does not have any statutes prohibiting same-sex marriage and that neither the Rhode Island legislature nor its courts had expressed disagreement with his 2004 opinion. Opinion at p. 5 & n. 8 (noting that the only marriages declared to be against Rhode Island public policy are bigamous marriages, incestuous marriages, and marriages between two mentally incompetent persons). Finally, he pointed to Rhode Island statutes prohibiting discrimination on the basis of sexual orientation, recognizing *de facto* parental status for same-sex partners, and extending health insurance benefits to domestic partners.

### State Supreme Court decision

However, later that same year, the Rhode Island Supreme Court gave a different answer to a similar question. In *Chambers v. Ormiston*, 935 A.2d 956 (R.I. 2007), that court considered whether the state's family court could recognize a Massachusetts same-sex marriage for the purpose of entertaining a divorce petition from that couple. In a 3-2 decision, the court held that the family court could not entertain such a petition, reasoning that the legislature that had created the family court in the early 1960s and given it jurisdiction to grant divorces would have understood the term "marriage" to mean a heterosexual union. The court relied upon contemporary dictionary definitions of marriage, as well as gender related references ("male party", "female party") in related statutes. The dissenting judges would have recognized the Massachusetts marriage for the limited purpose of entertaining the divorce petition without determining whether Rhode Island law would recognize it as a valid marriage for other purposes. The dissenting judges suggested that resolution of the general issue whether same-sex marriage is strongly against the public policy of Rhode Island "resides in the State House and not the courthouse." 935 A.2d at 974.

### 2.   New Jersey

*State Supreme Court decision*

In *Lewis v. Harris*, 908 A.2d 196 (N.J. 2006), the New Jersey Supreme Court ruled that same-sex couples are entitled, under the equal protection principles of that state's constitution, to the same privileges and benefits as are accorded to heterosexual couples, whether or not the same-sex relationship is denominated "marriage."[28]  The New Jersey legislature enacted a civil union law to implement that decision.  2006 N.J. Laws c. 103.

*Attorney General opinion*

After the *Lewis* decision and the enactment of the state's civil union law, the New Jersey Registrar of Vital Statistics asked the New Jersey Attorney General how the state would recognize same-sex relationships sanctioned under the laws of other states or countries.  The New Jersey Attorney General offered a functional test that related the nature of the rights granted in the other jurisdiction to the types of same-sex relationships recognized under New Jersey law.  *Opinion of the New Jersey Attorney General* 3-2007, 2007 WL 749807 (February 16, 2007).  Accordingly, same-

---

[28] Prior to the *Lewis* decision, the New Jersey Tax Court had considered the question of recognition for an out-of-state same-sex marriage. *Hennefeld v. Township of Montclair*, 22 N.J. Tax 166 (N.J. Tax Ct. 2005).  In that case, one member of a same-sex New Jersey couple had been disabled as a result of military service.  Consequently, they received a 50% disabled veteran's exemption from real estate taxes based upon the disabled individual's portion of the taxes of their joint residence.  They subsequently established a civil union in Vermont and later were legally married under Canadian law in Niagara Falls, Ontario.  They then filed an application with the local tax assessor in New Jersey to qualify for a 100% disabled veteran's tax exemption, which the assessor typically awarded to married couples.

Based largely on the fact that New Jersey law does not provide for same-sex marriage, the New Jersey Tax Court held that the couple's Canadian marriage would not be recognized in New Jersey.  It also held that New Jersey was not required by the Full Faith and Credit clause of the federal Constitution to give full effect to the couple's Vermont civil union.  However, the court construed the recently-passed New Jersey Domestic Partnership Act to permit the award of an exemption available to a married couple – such as the 100% exemption sought by the plaintiffs – to a same-sex couple.

sex marriages solemnized under the laws of other states or countries would be treated as civil unions in New Jersey, but the parties would not be required to obtain a New Jersey civil union license. The New Jersey Attorney General reasoned that "[r]ecognizing same-sex marriages established under Massachusetts law as civil unions in New Jersey both gives substantial effect to the Massachusetts relationships by providing all of the rights and obligations of marriage and comports with the intent of the New Jersey Legislature to provide those rights to same-sex couples through a civil union." *Id*. at p. 7 n.1.

### 3.    New Mexico

*Attorney General advisory letter*

After the *Goodridge* decision, the New Mexico Attorney General was asked whether a county clerk could issue a marriage license to a same-sex couple. The Attorney General answered the question in the negative in a brief advisory letter. *See* 2004 WL 2019901 (February 20, 2004). Although no statute in New Mexico explicitly limits marriage to heterosexual couples, the marriage statutes use the terms "husband" and "wife" and the state legislature has adopted a marriage application form that presupposes a male and female applicant. Accordingly, the New Mexico Attorney General concluded that New Mexico law did not allow for same-sex marriage. The advisory letter did not address whether that state would recognize same-sex marriages celebrated in other jurisdictions. To our knowledge, there are no reported court decisions in New Mexico concerning recognition of an out-of-state same-sex marriage.

### 4.    New York

As in the other states outlined above, no statute in New York expressly permits or prohibits same-sex marriage, but the state law has been interpreted to limit marriage to opposite-sex couples. The question of recognition of out-of-state same-sex marriages has been the subject of an Attorney General opinion, as well as a number of appellate decisions.

*Attorney General opinion*

In 2004, the New York Attorney General was asked whether there were any circumstances under which a same-sex marriage would be valid in New York. 2004 N.Y. Op. Atty. Gen. 1, 2004 WL

551537 (March 3, 2004). The New York Attorney General reasoned that the use of gender-specific terms (*e.g.*, "groom", "bride", "husband", "wife", "himself", "herself") in New York statutes concerning marriage evidenced a legislative intent not to extend marriage to same-sex couples, but opined that this conclusion raised constitutional questions best resolved by the courts. (The Court of Appeals of New York, that state's highest court, later agreed with the Attorney General's statutory interpretation and held that the limitation of marriage to heterosexual couples was constitutional. *See Hernandez v. Robles,* 855 N.E.2d 1 (N.Y. 2006)).

After concluding in the 2004 opinion that marriage was not available under New York law to same-sex couples, the New York Attorney General then proceeded to deal with the separate question of whether New York law would recognize a same-sex marriage validly performed in another jurisdiction. The Attorney General stated that New York common law generally provides for the recognition of valid, out-of-state marriages, regardless of whether the union would be permitted under New York law. 2004 WL 551537 at *11. "The only exceptions to this rule occur where recognition has been expressly prohibited by statute, or the union is abhorrent to New York's public policy.... The abhorrence exception is so narrow that only marriages involving 'polygamy or incest in a degree regarded generally as within the prohibition of natural law' have been deemed abhorrent by the courts." *Id.* (citations omitted). The opinion noted that the only New York court to have addressed the question of recognition of a same-sex foreign union had held that a party to a Vermont civil union must be treated as a "spouse" eligible to bring a wrongful death action. *See Langan v. St. Vincent's Hospital*, 765 N.Y.S.2d 411 (Sup. Ct. 2003). The opinion concluded that "[c]onsistent with the holding of the only state court to have ruled on this question, New York law presumptively requires that parties to such unions must be treated as spouses for purposes of New York law." *Id*. at *12.[29]

---

[29] Subsequent to the Attorney General opinion, *Langan* was reversed. *Langan v. St. Vincent's Hospital*, 802 N.Y.S.2d 476 (App. Div. 2005), *appeal dismissed*, 850 N.E.2d 672 (2006); *see also Langan v. State Farm Fire & Casualty*, 849 N.Y.S.2d 105 (2007) (holding that partner to a Vermont civil union was not a surviving "spouse" for purposes of the workers' compensation law); *see also Valentine v. American Airlines*, 791 N.Y.S.2d 217 (App. Div. 2005) (registered same-sex domestic partner not a "surviving spouse" for purposes of worker's compensation law).

*State court decisions*

Since the New York Attorney General's opinion, several cases concerning recognition of out-of-state same-sex marriages by state or local officials have been litigated in New York courts. In one case, a governmental body refused to recognize the marriage and denied certain benefits; the intermediate appellate court held that the marriage should have been recognized and the benefits provided. In three other cases, government officials sought to affirmatively recognize such marriages and were challenged in taxpayer suits; the appellate courts upheld the actions of the officials. Thus, in each instance the appellate court ruled in favor of the party favoring recognition of such marriages. However, the state's highest court has not ruled definitively on whether out-of-state same-sex marriages are recognized in New York generally.

In *Martinez v. County of Monroe*, 850 N.Y.S.2d 740 (App. Div. 2008), an employee of a New York community college married her same-sex partner in Ontario, where the marriage was valid under Canadian law. She then applied to the community college for spousal health care benefits for her partner, but the application was denied. A panel of the state's intermediate appellate court held that the marriage was entitled to recognition under New York law. The court stated that New York law recognized marriages solemnized outside its borders with two exceptions: (1) marriages prohibited by the "positive law" of New York; and (2) marriages prohibited by "natural law." Because no statute expressly forbade recognition of out-of-state same-sex marriages, the first exception was not applicable. The court further held that the "natural law" exception was limited to polygamy, incest, and marriages "offensive to the public sense of morality to a degree regarded generally with abhorrence", but the exception did not apply to same-sex marriages. The court concluded that, until the state legislature enacted a statute prohibiting recognition of same-sex marriages solemnized outside New York, such marriages were entitled to recognition in that state.

The state's highest court recently considered recognition of out-of-state same-sex marriages, but was able to decide the controversies before it without ruling on the general question of recognition. *Godfrey v. Spano*, 920 N.E.2d 328 (N.Y. 2009). *Godfrey* concerned two separate directives by government officials calling for recognition of out-of-state same-sex marriages. In one, the state's civil service department announced that it would recognize lawful out-of-state same-sex marriages for the purpose of extending health benefits to the spouses of state employees who

were parties to such marriages. Plaintiffs sought a declaratory judgment that this action was contrary to New York law. In the other, a county executive issued an executive order directing county officials under his jurisdiction "to recognize same sex marriages lawfully entered into outside the State of New York in the same manner as they currently recognize opposite sex marriages for the purpose of extending and administering all rights and benefits belonging to these couples, to the maximum extent permitted by law." Plaintiffs brought a taxpayer suit, challenging the order as inconsistent with New York law.

The New York Court of Appeals declined to decide the question whether New York law allows generally for recognition of out-of-state same-sex marriages. Rather, it held that the civil service commission had not abused its discretion under the pertinent statute in deciding to extend benefits to the same-sex spouses of employees. With respect to the county executive's directive, the court noted that no county funds had been expended that would not have been expended in the absence of the order and thus could not be the basis for a taxpayer suit under New York law. The majority expressed the hope that the state legislature "will address this controversy; that it will listen and decide as wisely as it can; and that those unhappy with the result – as many undoubtedly will be – will respect it as people in a democratic state should respect choices democratically made." 2009 WL 3849908 at *8 (internal citation omitted). Three concurring judges would have decided the broader question, reasoning that the majority's rationale could result in "an unworkable pattern of conflicting executive and administrative directives promulgated pursuant to the individual discretion of each agency head." *Id.*[30] *See also Godfrey v. DiNapoli*, 866 N.Y.S. 2d 844 (Sup.Ct. 2008) (upholding decision of state comptroller to recognize Canadian same-sex marriages for purposes of determining spousal retirement benefits); *Golden v. Patterson*, 877 N.Y.S.2d 822, 830 (Sup.Ct. 2008) (holding that Governor's office directive to executive branch agencies concerning recognition of out-of-state same-sex marriages did not exceed executive authority as it deferred to statutes and controlling court decisions on the subject).[31]

---

[30] The New York legislature recently rejected a bill to legalize same-sex marriage in that state. Peters, *New York State Senate votes down gay marriage bill*, New York Times (December 3, 2009).

[31] The directive of the New York Governor's office is described in
(continued...)

In the context of divorce actions, lower courts in New York have asserted jurisdiction to dissolve same-sex marriages contracted in other states. *See, e.g., C.M. v. C.C.*, 867 N.Y.S. 2d 884 (Sup. Ct. 2008) (finding jurisdiction to consider divorce of a same-sex couple who had been married in Massachusetts); *Beth R. v. Donna M.*, 853 N.Y.S.2d 501 (Sup. Ct. 2008) (recognizing Canadian same-sex marriage for purposes of considering divorce complaint); *but cf. B.S. v. F.B.*, 883 N.Y.S. 2d 458 (Sup. Ct. 2009) (dismissing divorce petition because Vermont civil union could not be treated as marriage). We are not aware whether recognition in this context has yet been considered by the state's appellate courts.

### E.  Summary

In the vast majority of states, the question of recognition of out-of-state same-sex marriages is relatively straightforward. Either state law clearly forbids recognition or state law allows same-sex marriage and would presumably recognize such a marriage from another state. The remaining states – Wyoming, which has a statute similar to Maryland, and the four states without a statute on same-sex marriage – illustrate several possible responses to the question of recognition of out-of-state same-sex marriages, but have not arrived at a consensus that suggests a particular answer in Maryland.

Rhode Island does not recognize an out-of-state same-sex marriage, at least for purposes of granting divorces, according to the decision of the state's highest court. New Jersey recognizes a same-sex marriage from another state as a civil union rather than a marriage, according to the New Jersey Attorney General. Lower courts in New York have recognized same-sex marriages from other states for the purpose of granting a divorce and the appellate courts have upheld the discretion of executive branch officials to recognize same-sex marriages for specific purposes; however, neither New York's highest court nor its legislature has definitively answered whether that state recognizes out-of-state same-sex marriages. It is not clear whether New Mexico will, or will not, recognize an out-of-state same-sex union. Wyoming has similarly been silent on the question.

---

[31] (...continued)
greater detail in Part VI.B. of this opinion.

**V**

**Whether the Court of Appeals
Would Recognize a Same-Sex Marriage**

We are not aware of any case in Maryland that directly addresses recognition of an out-of-state same-sex marriage that is valid in the location in which it was celebrated.[32]  Without any specific precedent to guide us, we review the general principles concerning recognition of out-of-state marriages employed by Maryland courts.

*A.    General Rule of Recognition Subject to Public Policy
Exception*

As summarized in Part II.C. of this opinion, Maryland courts follow the general rule that a marriage that is valid in the jurisdiction where it is contracted is valid in Maryland "unless it is contrary to the public policy of [Maryland]."  *Henderson*, 199 Md. At 458.[33]

---

[32] The Circuit Court for Baltimore County has held that its equity jurisdiction to annul a marriage under FL §1-201(a)(3) does not encompass a complaint to annul a Vermont same-sex civil union. *Lewis v. Smith*, Case No. C-07-13986 (Cir.Ct. Balto. Co. March 28, 2008).  The circuit court reasoned that the civil union was not a marriage under Vermont law, which distinguishes civil unions from marriages, or under Maryland law, citing FL §2-201 and the *Deane* case.  While the court's discussion of FL §2-201 and *Deane* might be read to imply that an out-of-state same-sex marriage would also not be recognized in Maryland, the case before it clearly did not involve an out-of-state marriage and, as noted in Part II.B. above, the Court of Appeals did not address the question of recognition of out-of-state same-sex marriages in *Deane*.

Prior to *Deane*, a 1993 opinion by a master for the Howard County Circuit Court analyzed in some detail the State law concerning marriage in considering whether to annul a marriage contracted by two female Maryland residents in Virginia during the 1980s. *See* Maryland Family Law Monthly Supplement (May 1993) at pp. 37-44.  However, it appeared that the marriage was prohibited by the law of Virginia at the time it was contracted.  Thus, that case did not concern recognition of a marriage valid in the place of celebration.

[33] In one passage the *Henderson* court describes the Maryland public policy exception as applying to marriages that are "contrary" to the public policy of Maryland; in another, it appears to refer to a public policy

(continued...)

This rule is based on the principle of comity, by which one state accommodates its own law to the law of another jurisdiction that is pertinent to a particular transaction or event. In the context of recognition of marriages, it presupposes that there are significant variations among states in the requirements for a valid marriage; otherwise, there would be no need for such a principle. The utility of the principle is based on the practical observation that "it would be ridiculous to have people's marital status blink on and off like a strobe light" as they traveled about the country. Koppelman, *supra*, 153 U. Penn. L. Rev. at 2155; *see also* Scoles & Hay, Conflict of Laws (1984) at p. 429 ("Refusal to recognize the validity of a foreign marriage ... tends to render uncertain one of the most important of human relations, a relationship in which certainty is surely as imperatively demanded as in commercial transactions").

However, the principle of comity does not require that a jurisdiction cede all its policy preferences to another jurisdiction simply because someone has crossed a state line. The principle of comity is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Aleem v. Aleem*, 404 Md. 404, 413, 947 A.2d 489 (2008) (holding that divorce obtained in Pakistan pursuant to civil analog of Islamic law would not be recognized because it was contrary to Maryland public policy expressed in Equal Rights Amendment). The public policy exception attempts to distinguish those prerequisites central to the state's conception of the institution of marriage from regulations that may be important but less critical. Applying the public policy exception is not a simple exercise and the answer with respect to a particular requirement may evolve over time. *Cf. Kramer v. Bally Park*, 311 Md. 387, 535 A.2d 466 (1988) (in deciding whether to recognize an out-of-state debt that arguably could not have been

---

[33] (...continued)
exception in stating generally that a state is not bound to give effect to marriages "repugnant" to its own laws and policies. *Henderson*, 199 Md. at 458-59. We attach no significance to the Court's use of these different terms. What is clear from *Henderson* and the other cases cited in the text is that the public policy exception is a limited *exception* to the general rule that a foreign marriage need not satisfy all the prerequisites of Maryland law to be valid in Maryland.

contracted in Maryland, the Court reviewed changes in Maryland law to assess public policy exception).[34]

### B. The Public Policy Exception in Maryland

More than a century ago, the Court of Appeals elaborated on the public policy exception to the general rule of recognition of out-of-state marriages, quoting at length from a Tennessee case. *Jackson v. Jackson*, 82 Md. 17, 29-30 33 A. 317 (1895). Under that formulation, the exception encompasses two categories:

> (1) marriages that are "contrary to the law of nature as generally recognized in Christian countries"; and

> (2) certain marriages prohibited by statute – in particular, statutes relating to "the morals and good order of society."

As examples of the first category – *i.e.*, marriages contrary to the law of nature – the Court listed polygamous marriages and incestuous marriages involving either the direct line of consanguinity or brothers and sisters. As to the second category, the Court noted that not all statutory limitations in Maryland law would trigger the public policy exception – for example, statutory provisions relating to "form and ceremony" would not.

As an example of a statute that would trigger the public policy exception, the *Jackson* Court cited a Maryland law that forbade interracial marriages – a prohibition enforced by criminal penalties. *Id*. at 30; *see also Henderson*, 199 Md. at 459. The Maryland statutes criminalizing interracial marriage were repealed shortly before the Supreme Court declared unconstitutional a similar

---

[34] In *Kramer*, a Maryland resident wrote a bad check to cover a gambling debt incurred at a New Jersey casino. When the casino sued Kramer in Maryland, he argued that Maryland's public policy against gambling would override the general choice-of-law principle under which Maryland courts would enforce a contract valid under the laws of another state – *i.e.*, New Jersey. Assuming for the sake of argument that the contract would be illegal under Maryland law, the Court of Appeals traced the development of various forms of legalized gambling in Maryland and held that Maryland's public policy against enforcement of gambling debts was not so strong as to preclude recognition of the New Jersey contract.

prohibition in Virginia.  *See* Chapter 6, §1, Laws of Maryland 1967; *Loving v. Virginia*, 388 U.S. 1 (1967).  However, the public policy exception to the general rule of recognition of out-of-state marriages may still pertain to other types of out-of-state marriages.  *Deane*, 401 Md. at 304 n.66.

Two decades after *Jackson* outlined the public policy exception, the Court of Appeals considered its application in a case involving an out-of-state marriage that would have been prohibited in Maryland under the statute limiting marriages between related individuals.  *Fensterwald v. Burk*, 129 Md. 131, 98 A. 358 (1916). That case arose out of an estate contest between a nephew and a niece of the decedent.  It was alleged that, to enhance the prospects for her inheritance, the niece had persuaded the uncle to marry her and, to avoid the prohibition in Maryland against uncle-niece marriages,[35] to travel to Rhode Island for the wedding.[36]  After the uncle died, the nephew sought an order that the marriage be declared null and void as contrary to the law of Maryland.  After quoting at length from *Jackson* on the general rule of recognition of out-of-state marriages and the public policy exception, the Court concluded that the marriage should be recognized.  It reasoned that the marriage was not incestuous "according to the generally accepted opinion of Christendom" and therefore not contrary to natural law.  Moreover, prior Maryland case law had characterized uncle-niece marriages as "voidable" rather than "void"; thus, the statutory prohibition did not place it in the category of marriages that would never be recognized.

Similarly, the courts have held that the fact that a Maryland statute requires a marriage ceremony and does not allow for common law marriages would not preclude recognition of a common law marriage contracted in a state that allows for such marriages.  *See, e.g.*, *Henderson*, 199 Md. at 459.

From this limited case law applying the public policy exception, it appears that the analysis begins, but does not end, with

[35] That prohibition currently appears in FL §2-202(c)(1)(xi), (xii).

[36] Like Maryland law, a Rhode Island statute forbade a marriage between a niece and an uncle.  However, a religious exception to that statute recognized the validity of a Jewish marriage of an uncle and niece, if permitted by Jewish law.  That exception was apparently invoked by the niece and uncle in *Fensterwald*.  The Maryland court declined to hold the Rhode Island statute unconstitutional.  129 Md. at 137.

statutes governing marriage in Maryland. In discerning whether a particular limitation triggers the public policy exception, consideration must also be given to the State's criminal law and other statutes regulating the conduct of couples. Changes in those laws may signal a change in the State's public policy that affects application of the public policy exception. In addition, consideration must be given as to whether the type of marriage is within the same category as polygamous and incestuous marriages.

## C.    *Discerning the Current Public Policy of Maryland*

### 1.    FL §2-201

The Maryland statute that most directly speaks to same-sex marriage is FL §2-201. It could be argued that this statute, which states simply that "[o]nly a marriage between a man and a woman is valid in this State," broadly prohibits any recognition of same-sex marriage in Maryland. After all, it does not say that only a heterosexual couple may obtain a marriage license in Maryland or be joined in a marriage ceremony in the State. Rather, it states that only such a monogamous heterosexual marriage is "valid" in the State. It would not be wholly unreasonable to conclude that the statute itself precludes recognition of an out-of-state same-sex marriage. On the other hand, the vast majority of states that have enacted statutes or constitutional provisions prohibiting same-sex marriage have used language that much more clearly addresses out-of-state same-sex marriages. *See* Hovermill, *supra*, 53 Md. L. Rev. at 487-88 (arguing that statutes should be explicit to express a strong public policy against recognition of an out-of-state marriage). Furthermore, the term "valid" can be a term of art that does not itself determine whether an out-of-state marriage would be recognized.[37]

---

[37] A law review article that pre-dated the enactment of FL §2-201 categorized various types of marriages with respect to Maryland law as "valid," "voidable," or "totally void." Strahorn, *Void and Voidable Marriages in Maryland and their Annulment*, 2 Md. L. Rev. 211 (1938). The term "valid" was used to denote a marriage "that meets all the requirements and encounters none of the impediments so that it can withstand both direct and collateral attack." *Id.* The article noted that, of the marriages that were not "valid" in Maryland – *i.e.*, those that were either "totally void" or "voidable" – State courts would recognize out-of-state marriages that fell within the "voidable" category under Maryland law and that were valid in the place of celebration. This may suggest that the term "valid" is not determinative of application of the public policy

(continued...)

It is unclear from the text of FL §2-201 whether the statute was intended to address recognition of out-of-state marriages. As noted above, at the time the statute was enacted in 1973 no jurisdictions allowed same-sex marriage. There is no extant legislative history that indicates what prompted the General Assembly to enact this statute. However, the historical context may offer a clue. It appears that, during the early 1970s, same-sex couples had attempted to obtain marriage licenses in several states, arguing that there was no express statutory prohibition against the issuance of a license to such a couple in those states. *See, e.g.*, *Singer v. Hara*, 522 P.2d 1187 (Wash. Ct. App. 1974); *Jones v. Hallahan*, 501 S.W.2d 588 (Ky. Ct. App. 1973); *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971); *see also* Note, *The Legality of Homosexual Marriage*, 82 Yale L.J. 573 (1973) (analyzing same-sex marriage with respect to equal protection and proposed equal rights amendment).[38] An Attorney General opinion issued a year before

---

[37] (...continued)
exception. *See also* Grossman, *supra*, 84 Or. L. Rev. at 447 & n. 70, 478 (suggesting that the fact that certain state statutes such as FL §2-201 that bar same-sex marriage but do not classify such marriages as "void" leaves open the possibility that out-of-state marriages would be recognized).

[38] In *Baker*, two men had sought a marriage license in Minnesota, arguing that there was no express statutory provision in Minnesota against issuing a license to a same-sex couple. The Minnesota Supreme Court rejected that contention, as well as an argument that such a prohibition would be unconstitutional. *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971). The appeal of the constitutional issue to the United States Supreme Court was later dismissed "for want of a substantial federal question." *Baker v. Nelson*, 409 U.S. 810 (1972).

The continuing significance of the Supreme Court's disposition of *Baker* has been the subject of some debate. *Compare Lockyer v. City and County of San Francisco*, 95 P.2d 459, 503-4 (Cal. 2004) (Kennard, J., concurring and dissenting) (*Baker* remains controlling precedent on federal constitutional issues) *and Wilson v. Ake*, 354 F.Supp.2d 1298, 1305 (M.D. Fla. 2005 ("*Baker v. Nelson* is binding precedent") *with Hernandez v. Robles,* 855 N.E.2d 1, 9 (N.Y. 2006) (rejecting argument that *Baker* controls resolution of constitutional issues) *and In re Kandu*, 315 B.R. 123, 138 (W.D. Wash. 2004) ("*Baker* is not binding precedent"). The case has also been a subject of questioning at recent Supreme Court confirmation hearings. *See* New York Times, Transcript - Sotomayor Confirmation Hearings – Day 3 (July 16, 2009), available at <http://www.nytimes.com/2009/07/15/us/politics/15confirm-text.html? pagewanted=62>.

the predecessor of FL §2-201 was enacted indicated that "an increasing number of persons of the same sex have been seeking marriage licenses..." 57 *Opinions of the Attorney General* 71 (1972). It seems quite likely that the Legislature enacted the statute simply to forestall the type of challenge to Maryland's practice in issuing marriage licenses that had been brought in Minnesota and other states.

It would not be until 1993 that a state court decision – *Baehr* – raised the possibility that a state would authorize a valid same-sex marriage that might possibly migrate to Maryland.[39] After the *Baehr* decision, there were repeated efforts in the General Assembly to amend FL §2-201 to include language similar to that in the laws of other states that prohibited recognition of such marriages. Those bills would have amended FL §2-201 to state explicitly that "[a] marriage between two individuals of the same sex that is validly entered into in another state or in a foreign country is not valid in this State." House Bill 1268 (1996); House Bill 398 (1997); Senate Bill 565 (1998); House Bill 1128 (1999); House Bill 531 (2001). All of those bills failed in the House Judiciary Committee.[40]

The efforts to amend FL §2-201 were redoubled after the 2003 *Goodridge* decision authorizing same-sex marriage in Massachusetts. One of those bills resulted in this Office considering the question of recognition of out-of-state same-sex marriages six years ago.

### 2. 2004 Advice Letter

In early 2004, a proposal was made in the General Assembly to amend the Maryland Constitution to incorporate the language of FL §2-201 barring same-sex marriage in an amendment to the State

---

[39] By early 1996, Ms. Baehr and her partner had moved from Hawaii to Baltimore. *See* L. Denniston, *Gay couple's final frontier; same-sex marriage: two women who applied for a marriage license in Hawaii and now live in Baltimore helped begin a new quest in the gay-rights movement*, Baltimore Sun p.1A (February 26, 1996).

[40] There was also an effort to amend FL §2-201 to substitute "two consenting adults" for "a man and a woman", which not only would have would have permitted recognition of out-of-state marriages, but would have allowed same-sex marriage in Maryland itself. House Bill 609 (1997); House Bill 1259 (1998); House Bill 919 (2000). All of those bills also received an unfavorable report from the House Judiciary Committee.

Constitution. House Bill 16 (2004); Senate Bill 673 (2004).[41] Other bills would have amended FL §2-201 to state explicitly that "[a] marriage between two individuals of the same sex that is validly entered into in another state or in a foreign country is not valid in this State" and to specify that "[m]arriages between individuals of the same sex are against the public policy of this State." House Bill 728 (2004); Senate Bill 746 (2004). In connection with the consideration of those bills, the question arose as to whether an out-of-state same-sex marriage would be recognized in Maryland under the existing law.

An advice letter from this Office thoroughly reviewed the existing law concerning the public policy exception to the general rule that out-of-state marriages are recognized in Maryland. Letter of Assistant Attorney General Kathryn M. Rowe to Delegate Joseph F. Vallario, Jr. (February 24, 2004) ("2004 Advice Letter"). At that time there were no cases, even in other states, that specifically addressed the recognition of same-sex marriages across state lines. The 2004 Advice Letter concluded that the policy expressed in FL §2-201 would likely be read to create a public policy exception to the general rule that a marriage valid where it is performed is considered valid in Maryland.[42] However, the 2004 Advice Letter observed that the results in marriage recognition cases sometimes appeared driven by the situations of sympathetic parties and that courts were reluctant to deny recognition "in light of the consequences to offspring and others." Thus, it concluded that the application of the public policy exception in this context "is far from clear or settled" and that a court might reach a different conclusion. *Id.* at pp. 6-7. The 2004 Advice Letter advised that the amendment of FL §2-201 consistent with the proposed bills would increase the

---

[41] The proposed constitutional amendments would have added a new Article XV, §8 to the Maryland Constitution that would provide that "[o]nly a marriage between a man and a woman is valid in this State." The bills were not passed.

[42] In a related letter, the Attorney General's Office indicated that, if a State official declined to recognize an out-of-state same-sex marriage and were sued for that decision, it would make this argument in defense of the official. Letter of Assistant Attorney General Robert A. Zarnoch to Delegate Luiz R.S. Simmons (February 27, 2004).

likelihood that a court would hold that the statute creates a public policy exception to the general rule of recognition. *Id*. at p.7.[43]

In the six years since the 2004 Advice Letter provided that qualified answer, there have been significant legal developments in Maryland's public policy toward committed same-sex intimate relationships and, as outlined in Part IV of this opinion, in the law of many other states. However, there has been no amendment of FL §2-201.

### 3. Legislative Efforts after 2004 Advice Letter

Since 2004, several bills have been introduced in the General Assembly that would have affected the conclusion of the 2004 Advice Letter concerning recognition of out-of-state same-sex marriages. Some of those bills would have affirmed the tentative conclusion of the 2004 letter; others would have effectively reversed it.

Several bills would have explicitly stated in statute that same-sex marriages valid in other states would *not* be recognized in Maryland. Senate Bill 746 (2004); House Bill 728 (2004); House Bill 693 (2005); House Bill 90 (2010); Senate Bill 852 (2010).[44] Other bills proposed constitutional amendments. There were several proposals for a State constitutional amendment providing, like FL §2-201, that only a marriage between a man and a woman is valid in Maryland. Senate Bill 673 (2004); House Bill 16 (2004); House Bill 1220 (2005); House Bill 1393 (2006); Senate Bill 262 (2006); House Bill 48 (2006); Senate Bill 690 (2006); House Bill 1716 (2006); House Bill 919 (2007); Senate Bill 564 (2007); Senate Bill 169 (2008). Two bills would have amended the State Equal Rights Amendment (Declaration of Rights, Article 46) to prevent it from being a basis for overturning the statutory prohibition against same-sex marriage. Senate Bill 900 (2006); House Bill 1637 (2006). Other proposed amendments would have also made clear that out-of-state same-sex marriages are not valid in Maryland. House Bill 1345

---

[43] The bills did not pass.

[44] Senate Bill 852 remains pending in the Senate Judicial Proceedings Committee as of the date of this opinion.

(2008); Senate Bill 647 (2009); House Bill 913 (2009); House Bill 1079.[45] All measures filed in sessions through 2009 failed.

More recently, several bills have been introduced to amend FL §2-201 to *allow* same- sex marriages in Maryland. Senate Bill 290 (2008); House Bill 351 (2008); Senate Bill 565 (2009); House Bill 1055 (2009); Senate Bill 582 (2010); House Bill 808 (2010); House Bill 1279 (2010).[46] If the statute had been modified in that way, the analysis of the 2004 Advice Letter would have been effectively overruled, as the basis for a public policy against recognition of such out-of-state marriages would no longer exist. However, those measures filed in sessions through 2009 also failed.[47]

In failing to amend FL §2-201, the General Assembly has not buttressed, as suggested by the 2004 Advice Letter, the tentative conclusion that out-of-state same-sex marriages would not be recognized by Maryland courts. Conversely, it has not explicitly spoken in favor of recognition of such marriages by the courts. However, other enactments of the Legislature demonstrate an evolution in public policy toward intimate same-sex relationships.

### 4. Evolution of Public Policy Relating to Same-Sex Relationships

Maryland's public policy concerning marriage has not been static. As previously recounted, during part of the colonial period, only marriages consecrated according to the liturgy of the Church of England were authorized in Maryland. Within living memory, the Court of Appeals could describe interracial marriage as not only against the State's public policy, but "repugnant" to it. Neither policy has endured. Undoubtedly, a same-sex marriage, even if valid in another state, would have been obviously contrary to the public policy of Maryland in the past, given the laws criminalizing

---

[45] House Bill 1079 remains pending in the Senate Judicial Proceedings Committee as of the date of this opinion.

[46] The 2010 bills listed are pending in either the Senate Judicial Proceedings Committee or the House Judiciary Committee as of the date of this opinion.

[47] As of the date of this opinion, the latest version of such a bill is pending in the State Senate. *See* Senate Bill 582 (2010).

homosexual sexual activity. However, the same cannot be said today.

*Criminal laws*

At one time the public policy of Maryland, as expressed in its criminal laws, prohibited same-sex intimate sexual conduct. *See* Annotated Code of Maryland, Criminal Law ("CR"), §3-322 (prohibiting "unnatural or perverted sexual practices"). The State ceased enforcement of such laws some years ago. *See Schochet v. State,* 320 Md. 714, 580 A.2d 176 (1990) (construing statute not to restrict private, non-commercial, consensual sexual conduct of heterosexual couple); *Williams v. Glendening*, No. 98036031/CL-1059, 1998 WL 965992 (Balto. City Cir. Ct 1998) (enjoining application of statute to same-sex couples); Letter of Assistant Attorney General Robert N. McDonald to Delegate Sue Hecht (October 29, 1999) (concluding that Court of Appeals would likely reach same result as circuit court did in *Williams*). The Supreme Court subsequently held that such laws are unconstitutional. *Lawrence v. Texas*, 539 U.S. 558 (2003).[48]

In 2005, the Legislature amended the statutes concerning "hate crimes" to include violent crimes motivated by animus toward a person's sexual orientation. Chapter 571, Laws of Maryland 2005, *codified in* CR §10-301 *et seq.*

*Anti-discrimination measures*

Subject to some exceptions, State law prohibits discrimination based on sexual orientation in public accommodations, housing, and employment. Annotated Code of Maryland, State Government Article ("SG"), §§20-304 (public accommodations), 20-601 *et seq.* (employment), 20-701 *et seq.* (housing). In addition, it forbids such discrimination by private entities regulated by the Department of Labor, Licensing, and Regulation. SG §20-402. While the law that enacted these prohibitions was carefully drafted to make clear that it did not authorize same-sex marriage itself or endorse any

---

[48] The Court in *Lawrence* declined to address the validity of same-sex marriage, stating that the case did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." 539 U.S. at 578.

particular form of sexual behavior,[49] it reflects a change in public policy concerning the acceptable treatment of gay and lesbian individuals.

An executive order entitled the State Code of Fair Employment Practices prohibits employment discrimination in State employment based on sexual orientation, among other things. COMAR 01.01.2007.16 at Article I(A)(13). Many executive branch agencies in the State have adopted regulations forbidding discrimination on the basis of sexual orientation in the conduct of various State programs. *See Deane*, 401 Md. at 338-39 n.17 (Raker, J., concurring and dissenting) (cataloging various anti-discrimination provisions). Other regulations prohibit such discrimination by individuals licensed by the State in the conduct of their professions or occupations. *Id.* Various county and municipal laws similarly prohibit discrimination on the basis of sexual orientation in matters within the purview of the local government. *Id*. at 340-41.

In 2006, the Legislature enacted a statute barring discrimination on various bases, including sexual orientation, in connection with State contracts. Chapter 283, Laws of Maryland 2006, *codified at* Annotated Code of Maryland, State Finance & Procurement Article, §19-101 *et seq.*

---

[49] The law included uncodified language stating that it:

> (1) may not be construed to authorize or validate a marriage between two individuals of the same sex;
>
> (2) may not be construed to require or prohibit an employer to offer health insurance benefits to unmarried domestic partners;
>
> (3) does not mandate any public or private educational institution to promote any form of sexuality or sexual orientation or to include such matters in its curriculum; and
>
> (4) is intended to ensure specific defined rights and not to endorse or confer legislative approval of any form of sexual behavior.

Chapter 340, §2, Laws of Maryland 2001. *See* Part II.B.1 & n. 9 above.

*Adoption*

The Court of Appeals has not had occasion to address whether same-sex couples may adopt a child together in Maryland. *See Janice M. v. Margaret K.*, 404 Md. 661, 665 & n.3, 696 & n.1, 948 A.2d 73 (2008). However, this Office has previously concluded that Maryland law permits adoption by same-sex couples, a conclusion endorsed by some members of the Court. *See* Letter of Assistant Attorney General Kathryn M. Rowe to Delegate Sharon Grosfeld (June 9, 2000); *see also Deane*, 401 Md. at 332-36 (Raker, J., concurring and dissenting) (analyzing parental rights of same-sex partners under Maryland law).

*Rights and Benefits of Domestic Partners*

The General Assembly recently enacted legislation recognizing domestic partnerships,[50] a term that includes same-sex couples as well as couples of different sexes, for the purpose of conferring rights concerning medical decision-making and hospital visitation, among other things. Chapters 590, 599, Laws of Maryland 2008; Chapter 602, Laws of Maryland 2009. In particular,

---

[50] A "domestic partnership" is defined as:

> a relationship between two individuals who:
>
> (1)   are at least 18 years old;
> (2)   are not related to each other by blood or marriage within four degrees of consanguinity under civil law rule;
> (3)   are not married or a member of a civil union or domestic partnership with another individual;
> (4)   agree to be in a relationship of mutual interdependence in which each individual contributes to the maintenance and support of the other individual and the relationship, even if both individuals are not required to contribute equally to the relationship.

Annotated Code of Maryland, Health-General Article, §6-101. For purposes of a recordation and transfer tax exemption, domestic partners must also share a common residence where they both live. Annotated Code of Maryland, Tax-Property Article, §12-101(e-2).

a domestic partner is entitled to make health care decisions for an incapacitated partner under certain circumstances. Annotated Code of Maryland, Health-General Article ("HG"), §§5-605, 5-612. A domestic partner has visitation rights with respect to a partner in health care facilities and during emergency medical transport. HG §6-202. Domestic partners who are in a nursing home have a right to share a room, as well as to have private visits. HG §19-344(h), (k). A domestic partner may consent to the autopsy of a deceased partner, has certain rights concerning disposition of the remains, and may consent to organ donation. HG §§4-215, 5-501, 5-509, 19-310. Transfers of residential property between domestic partners are exempt from recordation and transfer taxes. Annotated Code of Maryland, Tax-Property Article, §§12-108(c)-(d), 13-207(a)-(b), 13-403(b). The State inheritance tax does not apply to a primary residence held in a joint tenancy that passes from a decedent to his or her domestic partner. Annotated Code of Maryland, Tax-General Article, §7-203(*l*).

While the 2008 domestic partner legislation extended many rights and benefits to committed same-sex couples, it explicitly disclaimed any intent to alter Maryland's policy concerning same-sex marriage. *See* Chapter 590, §3; Chapter 599, §2, Laws of Maryland 2008 ("this Act may not be construed to have any effect on §2-201 of the Family Law Article").

During the past year, the State Department of Budget and Management ("DBM") amended its regulations to recognize same-sex domestic partners of State employees as dependents eligible for health insurance and certain other benefits tied to public employment.[51] *See* COMAR 17.04.13.03A9(c). That policy development was subject to legislative oversight by the Joint Committee on Administrative Executive, and Legislative Review, as well as the budget committees. *See* SG §10-110; Department of Legislative Services, Analysis of the FY 2010 Maryland Executive

---

[51] The regulations were carefully crafted to ensure that they did not contravene related federal standards that, under the federal Defense of Marriage Act, limit the concept of "spouse" to heterosexual couples. *See* Part III.B.2 above. Guidance later issued by DBM reiterated the understanding that an out-of-state same-sex marriage of an employee would not be recognized under Maryland law as a marriage and that the employee's domestic partner would not be considered a "spouse" (as opposed to a domestic partner) for the purpose of employee benefits. DBM, *Same Sex Domestic Partner Frequently Asked Questions* (July 2009-June 2010) at. p. 4.

Budget (2009), F10A02 at p.21. Some local governments have accorded similar recognition to domestic partners, which the Court of Appeals has found to be consistent with the powers of home rule governments under Maryland law. *See Tyma v. Montgomery County*, 369 Md. 497, 801 A.2d 148 (2002) (county had authority to extend health insurance to same-sex domestic partners of county employees).

*Summary*

At the time that FL §2-201 was enacted in the early 1970s, one might have said, with confidence, that same-sex marriage was so contrary to the State's public policy, as expressed in a number of ways in addition to FL §2-201, as to trigger the public policy exception. Thirty years later, as the 2004 Advice Letter indicated, that conclusion could still be drawn, but with considerably less confidence. As the various opinions in the *Deane* case acknowledged and as these enactments demonstrate, the State's public policy toward committed intimate same-sex relationships has gradually shifted from one of condemnation to one of respect and, in certain ways, support. While the Legislature has been steadfast in maintaining the limitation expressed in FL §2-201,[52] at the same time, the statute no longer expresses a public policy of the State that so condemns same-sex relationships as to create an exception to principle of comity that usually governs recognition of out-of-state marriages.

### 5. Comparison to Polygamous and Incestuous Marriages

Two categories of marriages frequently identified as subject to the public policy exception are polygamous marriages and incestuous marriages. *See Jackson v. Jackson*, *supra*, 82 Md. at 29-30. Maryland's developing public policy concerning intimate same-

---

[52] *See* Chapter 590, §3, Laws of Maryland 2008; Chapter 599, §2, Laws of Maryland 2008; Chapter 340, §2, Laws of Maryland 2001. These provisions stated that the Legislature did not intend to "authorize" or "validate" same-sex marriage or affect FL §2-201 in providing certain protections to same-sex couples, thus reaffirming the policy underlying FL §2-201. However, they did not address the question of recognition of out-of-state marriages or whether the policy underlying FL §2-201 would override the general principle of comity.

sex relationships may be contrasted to its policies concerning polygamous and incestuous relationships.

*Polygamous marriages*

Some have suggested that arguments in favor of recognizing out-of-state same-sex marriages valid in the place of celebration could also be applied to foreign polygamous marriages that are valid in the jurisdiction of celebration. *See, e.g.,* Epstein, *Of Same Sex Relationships and Affirmative Action: The Covert Libertarianism of the United States Supreme Court*, 12 Sup. Ct. Econ. Rev. 75, 96 (2004); Sunstein, *Liberty After Lawrence*, 65 Ohio St. L.J. 1059, 1073 (2004); Myers, *Polygamist Eye for the Monogamist Guy: Homosexual Sodomy ... Gay Marriage ... Is Polygamy Next?*, 42 Hous. L. Rev. 1451, 1472-73 (2006).

It is true that there are more jurisdictions in the world that permit polygamous marriage than same-sex marriage. *See* Smearman, *Second Wives' Club: Mapping the Impact of Polygamy in U.S. Immigration Law*, 27 Berkeley J. Int'l L. 382, 385-87 (2009) (noting that a half-million immigrants from countries in Africa, Asia, and the Middle East where polygamy is legal gained permanent resident status in the United States in 2007). And there are many more polygamous marriages valid in the place of celebration than same-sex marriages. Also, the statute that prohibits same-sex marriage in Maryland – FL §2-201– is also one of the statutes that most clearly reflects the State's policy in favor of monogamy.

However, there is a critical distinction between Maryland's public policy concerning same-sex relationships and its policy concerning polygamous relationships. While Maryland law does not allow for same-sex marriages, it provides significant recognition and support of same-sex relationships. Maryland law provides no recognition or support of polygamous relationships. Indeed, it remains a crime and a basis for disqualifying an individual from certain inheritance rights. CR §10-502 (bigamy); Annotated Code of Maryland, Estates & Trusts Article, §1-202(d) (an individual convicted of bigamy is not a "surviving spouse").[53]

---

[53] While it remains extremely unlikely that Maryland – or any state – would recognize foreign polygamous marriages generally, such marriages have been recognized by American courts for specific purposes, such as inheritance and property succession. For example, in a case

(continued...)

*Incestuous marriages*

With respect to incestuous marriages, some courts have found out-of-state marriages to be void as incestuous in violation of the forum state's public policy even though the local statute did not explicitly address marriages performed in other states. *See Osoniach v. Watkins*, 180 So. 577, 580 (Ala. 1938) (refusing to recognize Georgia marriage between nephew and uncle's widow); *Catalano v. Catalano*, 170 A.2d 726, 728-29 (Conn. 1961) (refusing to recognize incestuous marriage between uncle and niece obtained through dispensation in Italian law).

However, most such out-of-state marriages are recognized, as the variations among states do not appear to reflect basic differences in policy, but in the precise degree of relationship permitted. *See* Scoles & Hay, Conflict of Laws (1984) at p. 435 (while some statutes refer to marriages "'in violation of divine law', there certainly is a difference of legislative opinion as to what is divine"). As the *Fensterwald* case described above indicates, Maryland courts will recognize out-of-state incestuous marriages that would be considered "voidable" if performed in Maryland. In any event, as with polygamous relationships, there is no developing public policy in Maryland that supports incestuous relationships, even of the type recognized in *Fensterwald.* Indeed, incest remains a felony under Maryland law. CR §3-323.

### 6. Application of Public Policy Exception in Particular Contexts

A legislature may choose to accord universal recognition to a particular type of marriage – or not. A judicial determination

---

[53] (...continued) involving a native of India who died intestate in the United States, the court held that his two legally wedded wives in India would be allowed to share in the estate, and indicated that the public policy exception would have precluded recognition "only if decedent had attempted to cohabit with his two wives in California." *In re Dalip Singh Bir's Estate,* 188 P.2d 499, 502 (Cal. App. 1948); *see also* Scoles & Hay, Conflict of Laws (1984) at 446 ("The courts do recognize the legal existence of and give effect to foreign matrimonial unions that do not conform to requirements for the marriage relationship among their own people.... It may be doubted whether a foreign visitor would be permitted to cohabit here with his four wives, although even this is uncertain. Children of the union would probably be recognized as legitimate.").

whether to give effect to a particular out-of-state marriage will arise in the context of the facts of a particular case involving a determination of particular rights, benefits, and responsibilities. A decision whether to recognize an out-of-state marriage may be the predicate to a variety of questions for example:

- ✦ Does each partner owe the statutory obligation of spousal support to the other?

- ✦ Are confidential communications between the partners privileged from discovery? Does one have a privilege not to testify against the other?

- ✦ If one partner dies, is the other a "surviving spouse" for purposes of death benefit payments and other benefits from the decedent's employment? Will the partner be treated as a spouse under the estate and inheritance laws? What is the surviving partner's right to custody of a child of the deceased partner?

- ✦ May the couple obtain a divorce under Maryland law?

- ✦ If a party to a valid same-sex marriage in another state abandons the marriage without obtaining a divorce and moves to Maryland, is that individual eligible to marry under Maryland law?

- ✦ Do ethics provisions relating to spouses apply? For example, do ethical restrictions and reporting requirements relating to spouses apply with respect to the partner?

You have not asked us to answer questions like these – nor would we attempt to do so in an Attorney General opinion. The facts of a particular case matter, as do other laws pertinent to the particular right, benefit or responsibility. What we can do is identify some of the factors that may affect the Court's decision in a particular case.

*Relationship of Out-of-State Marriage to Maryland*

As suggested at the outset of this opinion, an out-of-state marriage may come within Maryland's jurisdiction in a variety of

ways.[54]  Some commentators have analyzed various situations by organizing them into several categories.  Koppelman, *supra*, 153 U. Penn. L. Rev. at 2152-63; Silberman, *Same-Sex Marriage: Refining the Conflict of Laws Analysis*, 153 U. Penn. L. Rev. 2195 (2005).  Those commentators have suggested that the particular category to which a marriage belongs may affect a court's application of the public policy exception.  While it is not clear whether Maryland Court of Appeals will draw such distinctions among these categories, the categories provide a useful rubric for describing the circumstances in which the question of recognition of a marriage may arise.

*"Migratory" or "mobile" marriages*.  A couple marries in the jurisdiction where they happen to reside at the time of their marriage.  They move to Maryland for reasons that have nothing to do with the marriage laws of the respective jurisdictions.  This is the classic scenario in which the Maryland courts apply the standard rule that a marriage that is valid in the place of celebration is also generally valid in the couple's new residence, subject to the public policy exception.  Some commentators have suggested that, even if a court would otherwise be inclined to apply the public policy exception to such a marriage, there may be circumstances where the court would recognize the marriage for particular purposes.  *See* Hammerle, *Free Will to Will? A Case for the Recognition of Intestacy Rights for Survivors to a Same-Sex Marriage or Civil Union*, 104 Mich. L. Rev. 1763 (2006).

*"Transient" or "visitor" marriages.*  The couple marries in another jurisdiction in which they reside.  They later travel to or through Maryland temporarily without any intention of residing in the State, but their marital status becomes legally significant for some reason.  For example, a same-sex couple validly married in Massachusetts may travel to Maryland for vacation or pass through en route to Washington, D.C.  An event may occur while the couple is in Maryland in which their marital status plays a role.  In such a situation, the State is called upon to recognize the married status of a couple that had never resided in Maryland, and indeed never intended to do so, for a very specific purpose.  A court may be

---

[54] See pp. 3-4 above.

particularly reluctant to invoke the public policy exception in such circumstances.[55]

*"Extraterritorial" marriages.* The couple marries in the jurisdiction in which they reside outside Maryland. However, unlike the previous two categories, in this scenario, the married couple never sets foot in Maryland. The validity of their marriage is significant in Maryland only because it affects a legal determination being made in Maryland, such as the probate of an estate. Again, a court may be reluctant to invoke the public policy exception, particularly if there are adverse effects on third parties. *See Developments in the Law, Constitutional Constraints on Interstate Same-Sex Marriage Recognition*, 116 Harv. L. Rev. 2028, 2043 (2003).[56]

*"Evasive" marriages.* Residents of a state that bars same-sex marriage travel to a jurisdiction that allows same-sex marriages for the specific purpose of avoiding the prohibition in their own state. They contract a valid marriage in the other jurisdiction – the place of celebration – and return to their own state. This may be the category in which a court would be least sympathetic to recognition of the marriage. *See* Wolff, *supra*, 153 U. Penn. L. Rev. at 2237-38.[57] Unlike some other states,[58] however, Maryland has never had

---

[55] One commentator posits a hypothetical situation in which one member of a same-sex couple travels to a state such as Maryland with their child. They are in an automobile accident and the adult dies. Is the child an orphan in the eyes of the State or will the State recognize the parental rights of the surviving spouse? *See* Koppelman, *supra*, 153 U.Penn. L.Rev. at 2160.

[56] It was in just such a context that American courts have sometimes recognized polygamous marriages. *See* note 53 above.

[57] A state that has adopted the "most significant relationship" standard of the Second Restatement may tend to apply the law of the state of domicile of the parties to determine the validity of the marriage. However, the Maryland courts have not adopted that standard and thus look to the law of the state in which the contract (*i.e.*, marriage) was formed. *See* note 15 above.

[58] Some states have statutes that specifically withhold recognition of evasive marriages. *See, e.g.,* Ariz. Rev. Stat. Ann. §24-112(c) ("parties residing in this state may not evade the laws of this state relating to

(continued...)

a statute directing the courts to withhold recognition of evasive marriages.  In fact, the evasive nature of the marriage contracted in Rhode Island in *Fensterwald* did not prevent the Court of Appeals from recognizing it.  Moreover, the factual inquiry required to distinguish "evasive" marriages from others might make such a distinction impractical in many contexts.

### *Particular Incidents of Marriage at Issue*

As noted above, a judicial decision whether to recognize an out-of-state marriage is often incidental to the determination of some other issue – *e.g.*, a right to inherit property of a deceased individual, a right to employment benefits, a right to sue for wrongful death.  Some commentators have observed that the courts frequently look to the policies underlying the ultimate issue to decide whether to recognize the particular marriage.[59]  This is sometimes referred to as the "incidents" approach to conflict of laws issues involving marriage.  *See* Reese, *Marriage in American Conflict of Laws*, 26 Int'l & Comp. L. Q. 952 (1977); Engdahl, *Proposal for a Benign Revolution in Marriage Law and Marriage Conflicts Law*, 55 Iowa

---

[58] (...continued)

marriage by going to another state or country for solemnization of the marriage"); Wis. Stat. §765.30 (providing criminal penalty for marrying in another state to evade Wisconsin marriage law).

A few states have had statutes designed to discourage out-of-state couples from marrying in that state to evade a marriage prohibition in the law of their domicile.  *See, e.g.,* Mass. G.L., §11 ("No marriage shall be contracted ... by a party residing and intending to continue to reside in another jurisdiction if such marriage would be void if contracted in such other jurisdiction, and every marriage in violation hereof shall be null and void"), *repealed by* Mass. Laws of 2008, Chapter 216, §1.  This provision was derived from the Uniform Marriage Evasion Act, approved by the National Conference of Commissioners of Uniform State Laws in 1912.  The Commissioners withdrew their approval in 1943 and few states have enacted the provision.  *See Cote-Whitacre v. Department of Public Health,* , 844 N.E.2d 623, 632 n.3 (Mass. 2006); *see also* Grossman, *supra*, 84 Or. L. Rev. at 465.

[59] As a review of the judicial application of various state statutes against inter-racial marriage to out-of-state marriages concluded: "These precedents hold that even an exceedingly strong public policy does not entail a blanket rule of nonrecognition.  Finer distinctions have to be drawn."  Koppelman, Same Sex, Different States: when Same-Sex Marriages Cross State Lines (Yale Univ. Press 2006) at p.49.

L. Rev. 56 (1969-70). It has been suggested that this approach is likely to be employed by courts presented with a question whether to recognize an out-of-state same sex marriage. "By considering only the incident of marriage before the court and the policies behind providing that incident of marriage to married couples, some courts may recognize the marriage, civil union, or domestic partnership for that particular purpose, even while refusing to honor the relationship for other purposes." Cox, *Using an "Incidents of Marriage" Analysis When Considering Interstate Recognition of Same-Sex Couples' Marriages, Civil Unions and Domestic Partnerships*, 13 Widener L.J. 699 (2004).

*Relationship of Federal Law to the Particular Incident*

As noted in Part III.B. above, the federal Defense of Marriage Act limits the definition of marriage to opposite-sex couples for purposes of federal law.[60] In some instances, State law incorporates federal law. In other instances, the Legislature or an agency delegated authority by the Legislature, has designed a State requirement to coincide with federal law. While federal law does not dictate whether or not an out-of-state same-sex marriage may be recognized in Maryland, it may affect that determination when State law is linked to federal law.

### 7. Summary

FL §2-201 embodies a policy against same-sex marriage, but likely was not originally intended to govern recognition of out-of-state marriages. The development of Maryland's public policy as to committed same-sex relationships over the past decade makes it increasingly unlikely that the Court would rely on the statute to invoke the public policy exception to the general rule of recognition of out-of-state marriages. Thus, in our view, the Court is likely to abide by the general rule of recognition, especially if the particular circumstances fit within the migratory, transient, or extraterritorial

---

[60] Even if Maryland courts ultimately decide to recognize out-of-state same-sex marriages in all respects, federal law still constrains extension of some benefits of marriage to such couples. For example, unless the federal Defense of Marriage Act is repealed or held unconstitutional, favorable federal tax treatment of employee benefits for married workers would not pertain to such couples. See Koppelman, Same Sex, Different States at pp. 120-130 (listing examples of federal laws for which marital status is relevant).

categories described above. While the Court may be least sympathetic in the context of an evasive marriage, there may be little basis under Maryland law for distinguishing that category from the others. Whether the Court will in fact recognize such an out-of-state marriage may also be affected by the facts and circumstances of the particular case before it, the particular incident of marriage at stake, and whether the particular issue is governed by or linked to federal law.

## VI

## Executive Orders

Finally, you asked whether the Governor may issue an executive order concerning the recognition of out-of-state same-sex marriages. Because you referenced a directive issued by the New York Governor's office concerning recognition of out-of-state same-sex marriages, we first briefly discuss that directive.

### A. New York Governor's Directive

In your request for this opinion you alluded to a directive issued by the New York Governor's Office in 2008. Some have suggested that the New York directive could serve as a model for an executive order in Maryland. *See Rethinking marriage*, Baltimore Sun (May 10, 2009) at p. 24A. The suggestion is perhaps based on the fact that, like Maryland, New York law does not permit same-sex marriages to be contracted in that state. *See* Part IV.D. of this opinion above.

However, the circumstances are not entirely analogous. The New York Governor did not issue a formal executive order. Nor was the informal directive that was issued by his office based solely on an opinion of the state attorney general. Rather, the directive consisted of a memorandum by the New York Governor's counsel to state agency counsel advising them of the *Martinez* decision[61] and of similar lower court decisions in the New York state courts. Memorandum of David Nocenti to All Agency Counsel (May 14,

---

[61] See description of the *Martinez* decision in Part IV.D. above. In contrast to the situation in New York, we have no direct guidance from Maryland courts on whether an out-of-state same-sex marriage is recognized under Maryland law.

2008).  The memorandum warned that, in light of those decisions, agencies that did not afford comity or full faith and credit to same-sex marriages valid in other jurisdictions might incur liability under the New York Human Rights Law.  The memorandum advised agency counsel to review their respective agency's statutes, regulations, and policy statements to ensure that terms such as "spouse", "husband," and "wife" were construed in a manner that encompassed valid same-sex marriages, unless another provision of law prevented such a construction.  A taxpayer challenge to the authority of the counsel's memorandum was rejected by a New York state trial court.  *Golden v. Patterson*, 877 N.Y.S.2d 822, 830 (N.Y. Sup.Ct. 2008) (holding that directive did not exceed executive authority as it deferred to statutes and controlling court decisions on the subject).[62]

### B.      *Governor's Authority under Maryland Law*

In Maryland, the Governor, as head of the executive branch, has broad powers to issue executive orders concerning guidelines, rules of conduct, or rules of procedure for State employees, units of State government, and persons who deal with State employees and agencies.  *See* SG §3-401(2).  The Governor's authority over the employment rights, obligations, and working conditions of executive branch employees is particularly well established.  *McCulloch v. Glendening*, 347 Md. 272, 282-87, 701 A.2d 99 (1997) (executive order granting unionization and collective bargaining rights to State employees); *MCEA v. Schaefer*, 325 Md. 19, 28, 599 A.2d 91 (1991) (executive order increasing work week of State employees). Similarly, an executive order may govern how executive branch employees deal with providers of services reimbursed by the State. *State v. Maryland State Family Child Care Ass'n*, 184 Md. App. 424, 445-49, 966 A.2d 939 (2009).

The Governor has less authority over private parties when promulgating an executive order and, in the absence of statutory authority, an executive order may not regulate the conduct of private parties.  *See* 78 *Opinions of the Attorney General* 148, 152 (1993) (while the Board of Public Works could adopt a regulation under its

---

[62] Also, as noted in Part IV.D. above, a recent decision by New York's highest court has affirmed the discretion of certain executive branch officials, within their respective areas of authority to recognize out-of-state same-sex marriages for specified purposes. *Godfrey v. Spano*, 920 N.E.2d 328 (N.Y. 2009).

statutory procurement authority to require State contractors to institute drug testing programs, the Governor could not do so by executive order).

In sum, unless the Legislature specifically delegates to the Governor the authority to issue an executive order on a particular subject, the Governor may not legislate by means of an executive order.[63]  Rather, any executive order issued by the Governor must concern matters within the purview of the executive branch and must be consistent with Maryland law, as enacted by the General Assembly and construed by the courts.

You have asked generally about the Governor's authority to issue an executive order concerning out-of-state same-sex marriages without reference to particular circumstances.  Any executive order issued by the Governor concerning recognition of out-of-state same-sex marriages would have to concern a subject within the purview of the executive branch.  (Many of the questions concerning recognition of marriages arise in the judicial branch).  Any executive order would also have to be consistent with any existing law relating to the particular subject.

# VII

## Conclusion

Our opinion is as follows:

The Court of Appeals would start from the general principle that a marriage that is valid in the place of celebration remains valid in Maryland.  There is an exception to that rule if the particular marriage is contrary to a strong State public policy.  A statute that limits marriage in Maryland to opposite-sex couples could be said to embody a policy against same-sex marriage.  However, there are many restrictions in the State's marriage statutes and the Court of Appeals has not construed the public policy exception to encompass all those restrictions.  For example, it has recognized common law

---

[63] The State Constitution allows the Governor to reorganize the executive branch by issuing an executive order, but any changes inconsistent with existing law must be set forth in statutory form and are not effective if disapproved by either house of the Legislature.  Maryland Constitution, Article II, §24.

marriages from other states, although there is no common law marriage in Maryland, and has recognized a Rhode Island marriage between an uncle and a niece, although a statute prohibits marriage between an uncle and a niece in Maryland.  Indeed, the public policy exception is a very limited one that the Court has seldom invoked.

While the matter is not free from all doubt, in our view, the Court is likely to respect the law of other states and recognize a same-sex marriage contracted validly in another jurisdiction. In light of Maryland's developing public policy concerning intimate same-sex relationships, the Court would not readily invoke the public policy exception to the usual rule of recognition.  You have posed the question in the abstract, but, of course, context matters.  For example, to the extent that a particular matter is governed by federal law, the federal Defense of Marriage Act, which limits marriage for federal purposes to opposite-sex couples, would prevent recognition of the marriage for that particular purpose.[64]

Finally, with respect to your question concerning the Governor's authority to issue an executive order, the Governor cannot legislate through an executive order.  An executive order of the Governor must be consistent with existing Maryland law, as enacted by the General Assembly and construed by the courts. While the State Constitution and statutes accord the Governor broad powers in certain areas – for example, in matters concerning executive branch employees – many questions concerning recognition of out-of-state marriages arise in the courts and cannot be addressed in an executive order.  The action of the New York Governor's office in 2008 is not entirely analogous.  In New York, the Governor's counsel issued a memorandum to various agencies in that state directing them to comply with a state court decision

---

[64] An advice letter of this Office written six years ago gave a qualified answer that out-of-state same-sex marriages would likely not be recognized under Maryland law.  While we reach a different conclusion today, in light of developments in the law concerning intimate same-sex relationships, we realize that State agencies have relied on that advice in setting agency policies concerning recognition of out-of-state marriages. In the absence of legislation or a definitive opinion of the Court of Appeals, a State agency that intends to change its existing policy concerning recognition of out-of-state same-sex marriages should first adopt any necessary regulations and conduct any appropriate deliberative process that permits consideration of the particular circumstances to which the agency's policy will apply and consider the possible applicability of federal law to those circumstances.

concerning recognition of out-of-state marriages; there is no similar court decision in Maryland.

Douglas F. Gansler
*Attorney General*

Robert N. McDonald
*Chief Counsel*
   *Opinions and Advice*